1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WAL-MART STORES, INC., a Delaware corporation, and WAL-MART REAL ESTATE BUSINESS TRUST, a Delaware statutory trust,**<br><br>     **Plaintiffs,**<br><br>          **v.**<br><br>**CITY OF TURLOCK, TURLOCK CITY COUNCIL, and DOES 1 through 10, inclusive,**<br><br>     **Defendants.** | **1:04-CV-05278 OWW DLB**<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed.R.Civ.P. 56)** |

**I.   INTRODUCTION**

Defendants the City of Turlock and the Turlock City Council (collectively, "the City") move for summary judgment against Plaintiffs Wal-Mart Stores, Inc., and Wal-Mart Real Estate Business Trust (collectively, "Wal-Mart").  Wal-Mart opposes the motion.

**II.   PROCEDURAL HISTORY**

The complaint was filed on February 11, 2004.  Doc. 1, Compl.  The City moved for summary judgment on March 29, 2005.  Doc. 50, Mot. for Summ. J.; Doc. 51, Mem. in Supp.  Wal-Mart

1  filed opposition on November 2, 2005.  Doc. 155, Mem. in Opp.
2  The City responded on December 12, 2005.  Doc. 190, Resp. in
3  Supp.  Oral argument was heard on February 6, 2006, during which
4  leave was granted to supplement the pleadings regarding whether
5  Wal-Mart's putative as-applied challenge to the Ordinance is
6  ripe.  Wal-Mart filed its supplemental response in opposition to
7  summary judgment on February 21, 2006.  Doc. 204, Suppl. Mem. in
8  Opp.  The City replied to the supplemental response on February
9  27, 2006.  Doc. 207, Reply to Suppl. Mem. in Opp.  Wal-Mart filed
10  its second supplemental response in opposition to summary
11  judgment on March 24, 2006.  Doc. 216, Suppl. Mem. 2d in Opp.

12                    **III.   BACKGROUND**

13        Wal-Mart states: "This litigation involves collusion between
14  Defendants the City of Turlock and the Turlock City Council . . .
15  and local supermarkets and local producers of goods by amending
16  the Turlock Zoning Code . . . and the City's Northwest Triangle
17  Specific Plan[.]" Doc. 155, Mem. in Opp., 1.  On November 20,
18  2003, the City Planning Commission (Commission) conducted a
19  public hearing regarding "proposed amendments to the [City]
20  zoning ordinance and the Northwest Triangle Specific Plan" that
21  would: (a) "Define and classify large-scale ('big box') retail
22  stores"; (b) "Require a Conditional Use Permit for certain large-
23  scale retail stores ('discount stores' and 'discount clubs')";
24  and (c) "Prohibit 'discount superstores' which are large-scale
25  (greater than 100,000 square feet) retail stores that also devote
26  more than 5% of sales floor area to non-taxable (grocery) items –
27  typically such stores contain a full service grocery department."
28  Doc. 191, Def.'s Resp. to Pl.'s Statement of Disputed Facts in

                              **2**

Opp. to Def.'s Mot. for Summ. J. [hereinafter, "Def.'s RSDF"; undisputed unless otherwise noted] #90.  On November 20, 2003, after public comment, the Commission voted to recommend the proposed ordinance to the Council.  Doc. 191, Def.'s RSDF #91.

On December 16, 2003, and January 13, 2004, the Council adopted Ordinance Nos. 1015-CS and 1016 (the Ordinance).  Doc. 165, Pl.'s Objections and Resp. to Def.'s Statement of Undisputed Facts in Opp. to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s RSUF"; undisputed unless otherwise noted] #1.  The Ordinance amended the City's Zoning Code and Northwest Triangle Specific Plan, and was codified in Sections 9-1-202 and 9-3-302 of the Turlock Municipal Code.  Doc. 165, Pl.'s RSUF #3.

The Ordinance created three new categories of commercial retail land uses: "Discount Stores," "Discount Clubs," and "Discount Superstores."  Doc. 165, Pl.'s RSUF #30.  "Discount Stores" are:

> stores with off-street parking that usually offer a variety of customer services, centralized cashing, and a wide range of products.  ["Discount Stores"] usually maintain long store hours seven (7) days a week.  The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station.  Discount stores are also sometimes found as separate parcels within a retail complex with their own dedicated parking.

Doc. 165, Pl.'s RSUF #31.

A "Discount Club" is:

> a discount store or warehouse where shoppers pay a membership fee in order to take advantage of discounted prices on a wide variety of items such as food, clothing, tires, and appliances; many items are sold in large quantities or bulk.

Doc. 165, Pl.'s RSUF #33.

3

A "Discount Superstore" is:

> a store that is similar to a "Discount Store" . . . with the exception that [it] also contain[s] a full-service grocery department under the same roof that shares entrances and exits with the discount store area.  Such retail stores exceed 100,000 square feet of gross floor area and devote at least five percent (5%) of the total sales floor area to the sale of non-taxable merchandise. . . .  These stores usually offer a variety of customer services, centralized cashing, and a wide range of products.  They typically maintain long store hours seven (7) days a week.  The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station.  Discount superstores are also sometimes found as separate parcels within a retail complex with their own dedicated parking.

Doc. 165, Pl.'s RSUF #32.  *See also* Ordinance No. 1016 (set forth in Decl. of Michael I. Cooke [hereinafter, "Cooke Decl."], Ex. B, 6).  The Ordinance definitions of "Discount Store," "Discount Club," and "Discount Superstore" closely resemble the definitions of these terms in *Trip Generation* (6th ed. 1997), a publication of the Institute of Transportation Engineers (ITE).  *See* Cooke Decl., Ex. G; *see also* Doc. 165, Pl.'s RSUF ##39-41 (undisputed as to the ITE definitions of these terms).

In Turlock, discount stores and discount clubs are permitted conditional uses in the C-C, C-H, and C-T commercial zones.  Doc. 165, Pl.'s RSUF ##34, 35.  Discount superstores are not permitted uses, conditional or otherwise, in any City zone.  Doc. 165, Pl.'s RSUF #36.  The Ordinance prohibits Plaintiff from siting a Wal-Mart Supercenter (a "Discount Superstore") in Turlock.  Doc. 165, Pl.'s RSUF #105.

The Ordinance's Preamble makes the following findings:

- WHEREAS, the [City] General Plan (including, but not limited to, policies 2.4-a, 2.4-g, 2.4-h, 2.4-

**4**

j, 2.4-k) establishes locational requirements for the [regional and neighborhood] retail centers: encouraging a number of neighborhood centers equally dispersed throughout the [C]ity while encouraging a concentration of regional shopping centers along the Highway 99/Countryside Drive corridor [Doc. 165, Pl.'s RSUF #5 (Preamble text undisputed)]; and

- WHEREAS, General Plan policies promote and encourage vital neighborhood commercial districts that are evenly distributed throughout the city so that residents are able to meet their basic daily shopping needs at neighborhood shopping centers [Doc. 165, Pl.'s RSUF #6 (Preamble text undisputed)]; and [¶] ...

- WHEREAS, given the changes in the retail sector and the evolution toward ever-bigger stores, it is necessary that the zoning ordinance be amended to regulate larger retail establishments appropriately and to afford them adequate review [Doc. 165, Pl.'s RSUF #7 (Preamble text undisputed)]; and

- WHEREAS, the [City] zoning ordinance (Title 9 of the [City] Municipal Code) has not kept pace with the evolution of the retail sector and fails to adequately distinguish the size, scale and scope of various retail activities; and [¶] ...

- WHEREAS, the establishment of discount superstores in Turlock is likely to negatively impact the vitality and economic viability of the [C]ity's neighborhood commercial centers by drawing sales away from traditional supermarkets located in these centers [Doc. 165, Pl.'s RSUF #9 (Preamble text undisputed)]; and

- WHEREAS, industry and academic studies indicate discount superstores rarely add any retail services currently not provided within a community, and that the majority of sales growth at a discount supercenter comes from a direct shift of dollars from existing retailers within a community, primarily from grocery stores [Doc. 165, Pl.'s RSUF #10 (Preamble text undisputed)]; and

- WHEREAS, discount superstores compete directly with existing grocery stores that anchor neighborhood-serving commercial centers [Doc. 165, Pl.'s RSUF #11 (Preamble text undisputed)]; and

- WHEREAS, smaller stores within a neighborhood center rely upon the foot traffic generated by the grocery store for their existence and in neighborhood centers where the grocery store closes, vacancy rates typically increase and deterioration takes place in the remaining center [Doc. 165, Pl.'s RSUF #12 (Preamble text undisputed)]; and [¶] ...

**5**

- WHEREAS, discount superstores adversely affect the viability of small-scale, pedestrian-friendly neighborhood commercial areas, contributing to the blight in these areas [Doc. 165, Pl.'s RSUF #13 (Preamble text undisputed)]; and
- WHEREAS, the [Ordinance's proposed zoning changes] are intended to preserve the [C]ity's existing neighborhood-serving shopping centers that are centrally located within the community ... [Doc. 165, Pl.'s RSUF #15 (Preamble text undisputed)]; and
- WHEREAS, the [C]ity's current distribution of neighborhood shopping centers provides convenient shopping and employment in close proximity to most residential neighborhoods in Turlock, consistent with the Turlock General Plan [Doc. 165, Pl.'s RSUF #16 (Preamble text undisputed)]; and
- WHEREAS, this distribution of shopping and employment creates a land-use pattern that reduces the need for vehicle trips and encourages walking and biking for shopping, services, and employment [Doc. 165, Pl.'s RSUF #17 (Preamble text undisputed)].

*See also* Cooke Decl., Ex. A (Ordinance No. 1015-CS); *Wal-Mart Stores, Inc. v. City of Turlock*, 138 Cal.App.4th 273, 283-84 (2006).

Between January 1, 2003, and January 26, 2005, Wal-Mart did not file an application with the City for a development permit. Doc. 165, Pl.'s RSUF #95. On January 26, 2005, Doucet & Associates, Inc., an engineering firm, filed documents with the City on Wal-Mart's behalf that the firm referred to as "an application for entitlements for a Wal-Mart Supercenter proposed for development in Turlock." Doc. 165, Pl.'s RSUF #96. Defendants claim that the application was incomplete in that it did not include a floor plan, and the City could not determine whether the Ordinance would permit the proposed development or not. *Id.*, Pl.'s RSUF #97; *see also id.*, Pl.'s RSUF #98 (*citing* City Municipal Code Section 9-5-102: "An application for a permit . . . shall be accompanied by maps, drawings, and data as

**6**

necessary to evaluate the proposed request for conformance with the General Plan and the provisions of this chapter"). Wal-Mart alleges that the January 26, 2005, application "contained all information required in the City's application." *Id.*, Pl.'s RSUF #97 (response).

On April 15, 2005, Wal-Mart filed a revised application with the City. The revised application included revisions of several of the documents originally submitted to the City. Doc. 191, Def.'s RSDF #121. City Planning Manager Michael I. Cooke responded to Plaintiff's April 15, 2005, revised application on May 9, 2005, by letter, stating that the "revised application you provided contains the information I need to determine how the ordinance applies to your project." *Id.*, Def.'s RSDF #123. The letter states that, based on the sales floor area figures, the project "is defined by [the City's] large-scale retailer ordinance as a 'Discount Superstore.' Therefore, it is prohibited and I am returning your application fees herewith." *Id.*, Def.'s RSDF #124. See Doc. 204, Suppl. Mem. in Opp., 2.

Wal-Mart alleges its representatives originally began negotiations with the City in December 2002 to establish a Wal-Mart Supercenter in Turlock, Doc. 191, Def.'s RSDF #1 (Response: "irrelevant"); that these negotiations appeared likely to succeed as late as July 2003, when Wal-Mart purchased the real property for the prospective Supercenter, *id.*, Def.'s RSDF ##9, 10 (Response: "irrelevant"); that about that time, local grocery store owners learned of Wal-Mart's plans, and began lobbying the Council to exclude Wal-Mart from Turlock in order to protect themselves from Wal-Mart's competition, *id.*, Def.'s RSDF ##11-65

**7**

(Response: "irrelevant")[1]; and that their efforts were rewarded with the Ordinance, Doc. 155, Mem. in Opp., 8-11.

Wal-Mart claims the City's expressions of concern for air quality, traffic flows, and urban blight are pretextual, and the City's true motive is to protect local retailers from competition in violation of the Commerce Clause and Equal Protection Clause of the United States Constitution, and the Equal Protection Clause of the California Constitution. Doc. 155, Mem. in Opp., 12-48. Wal-Mart also argues the Ordinance is void for vagueness under the United States Constitution's Due Process Clauses. *Id.,* 48-50.

In a case brought by Wal-Mart in state court against the City, Case No. F047372, the California Court of Appeals for the Fifth Appellate District recently upheld the Ordinance, rejecting Wal-Mart's challenges that the City unconstitutionally exceeded its police powers and failed to comply with the California Environmental Quality Act:

> (1) a city may exercise its police power to control and organize development within its boundaries as a means of serving the general welfare, (2) [the] City made a legitimate policy choice when it decided to organize development using neighborhood shopping centers dispersed throughout the city, (3) the [O]rdinance was reasonably related to protecting that development choice, and (4) no showing was made that the restrictions significantly affected residents of surrounding communities. Accordingly, the restrictions in the ordinance bear a reasonable relationship to the general welfare and, thus,

---

[1] "[The] City . . . acknowledges that, in August 2003, representatives of unions and existing local supermarkets began meeting with and lobbying members of the [ ] Council to prevent the development of 'big box' stores containing grocery departments." *Wal-Mart*, 138 Cal.App.4th at 280.

**8**

[the] City constitutionally exercised its police
power.

*Wal-Mart*, 138 Cal.App.4th at 279.  Wal-Mart did not raise, nor did the state court decide, its federal or state equal-protection, Commerce Clause, or void-for-vagueness claims.  *Wal-Mart*, 138 Cal.App.4th at 299 n.21.

### IV.   LEGAL STANDARD

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed.R.Civ.P. 56(c); *Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id.*  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law."  *Campbell*, 138 F.3d at 782 (*quoting Anderson*, 477 U.S. at 248).

The non-moving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).   Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.   A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

### V.   ANALYSIS

The complaint asserts seven claims for relief.   Doc. 1, Compl., ¶¶ 28-63.   The first alleges Wal-Mart Supercenters are situated similarly to a range of other retail formats – Discount Clubs, multi-roof shopping centers that offer goods and services similar to those available in a stand-alone Wal-Mart Supercenter, large-scale grocers, and Discount Stores – for purposes of preserving traffic flows and air quality and preventing urban blight, *id.*, ¶¶ 29-32, but the Ordinance prohibits Wal-Mart Supercenters in Turlock and allows the other retail forms, in

violation of the Equal Protection Clause of the United States Constitution.

The second claim for relief alleges the disparate treatment alleged in the first claim for relief also violates the Equal Protection Clause of the California Constitution. *Id.*, ¶¶ 36-40.

The third claim for relief alleges Wal-Mart is an out-of-state corporation, and is the only retailer doing business in California that operates or plans to operate a Discount Superstore; the Ordinance only operates to impose restrictions on Wal-Mart, an out-of-state company; and the Ordinance therefore discriminates in purpose and effect in favor of in-state interests and against out-of-state interests, resulting in an unlawful burden on interstate commerce, in violation of the Commerce Clause of the United States Constitution. *Id.*, ¶¶ 42-46.

The fourth claim for relief alleges the Ordinance is unconstitutionally vague and uncertain, in that it: (1) provides prospective retailers no guidance regarding their categorization under the City's zoning ordinances; (2) confers on the City almost unlimited discretion to determine how a large retailer should be classified; and (3) would inevitably lead to inconsistent application of the Ordinance. *Id.*, ¶ 50.  The Ordinance is also claimed to be vague and uncertain because the definition of "food and beverage sales," on its face, places absolutely no restrictions on supermarkets or grocery stores, even though supermarkets and grocery stores may expand over 100,000 square feet, and devote more than 5% of their floor-space to non-taxable goods. *Id.*

**11**

The fifth claim for relief alleges deprivation of constitutional and federal statutory civil rights under color of state law, and seeks damages under Title 42, Section 1983, of the United States Code.  Attorneys' fees are also sought under Section 1988.  *Id.*, ¶¶ 54-56.

The sixth claim for relief seeks a declaration that the Ordinance is void, reasserting the California and federal equal-protection, Commerce Clause, and void-for-vagueness claims.  *Id.*, ¶¶ 57-60.

The seventh claim for relief requests a temporary restraining order, preliminary injunction, and permanent injunction against enforcement of the unlawful Ordinance.  *Id.*, ¶¶ 61-63.

The City moves for summary judgment as to all of Wal-Mart's claims.  Doc. 51, Mem. in Supp. of Mot. for Summ. J.

A.   Facial Versus As-Applied Challenge

   1.   Complaint Asserts Only Facial Challenge

Wal-Mart claims it has asserted both facial and as-applied challenges to the Ordinance.  Doc. 155, Mem. in Opp., 12-14; Doc. 216, Suppl. Mem. 2d in Opp., 3-4.  Wal-Mart argues the City has moved for summary judgment only as to Wal-Mart's facial challenges, not its as-applied challenges, and summary judgment regarding the as-applied challenges is improper, even if summary judgment regarding the facial challenges is granted.  Doc. 216, Suppl. Mem. 2d in Opp., 2, 4-10.

The complaint was filed on February 11, 2004.  Doc. 1, Compl.  The City did not deny Wal-Mart's entitlement application until May 9, 2005.  Doc. 191, Def.'s RSDF #123.  Wal-Mart has not

**12**

amended its complaint.  Wal-Mart argues "[t]he [c]omplaint contains more than sufficient allegations to state a claim that application of the Ordinance to Wal-Mart violated the [E]qual [P]rotection [C]lauses in the federal and state constitutions." Doc. 216, Suppl. Mem. 2d in Opp., 3.

> Wal-Mart alleges [] it was "ready and able" to build a Supercenter in Turlock (Complaint ¶¶ 25-27) and [] the actions of the City, based on the Ordinance, prevented its development plan. Complaint, ¶ 25.  What is more, Wal-Mart alleges [] it is similarly situated to other business entities that are treated differently (Complaint ¶¶ 29-32, 36-39), [] there is no rational basis for this differential treatment[,] and the reasons for the discriminatory treatment are impermissible, including because the City acted with animus and bad faith toward Wal-Mart. Complaint ¶[¶] 11-24, 29-32, 36-39.  These allegations are sufficient to state an as[-]applied claim.

*Id.*, 4.

An "as applied" challenge is a claim that the operation of a statute is unconstitutional in a particular case, while a "facial" challenge alleges the statute may rarely or never be constitutionally applied.  When faced with a claim that application of a statute renders it unconstitutional, a court must analyze the statute as applied to the particular case, *i.e.*, how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations.  16 C.J.S. *Constitutional Law* § 187.

> [A]n as-applied challenge claims [] the government's conduct as permitted by a statute violated the defendant's rights.  *The violation is specific to the facts of the defendant's case*, and the statute is flawed only to the extent it permitted the government to act in that case.  In contrast, a facial challenge claims [] the defendant was acted upon pursuant to a statute that itself was constitutionally improper.  The

harm claimed is not a direct violation of the
defendant's constitutional rights, but rather a
more abstract claim that the defendant was acted
upon pursuant to a statute that has some kind of
constitutional defect.

Orrin S. Kerr, *Congress, the Courts, and New Technologies: A Response to Professor Solove*, 74 Fordham L. Rev. 779, 787 n.50 (2005) (emphasis added).

The February 11, 2004, complaint could not have, and did not, allege the City violated Wal-Mart's constitutional rights in applying the Ordinance to deny Wal-Mart's Supercenter permit application, because the City did not apply the Ordinance to Wal-Mart's Supercenter supplemented application until May 9, 2005. The complaint does not allege facts regarding the specific application of the Ordinance to Wal-Mart's Supercenter permit application.  The complaint alleges animus, bad faith, and impermissible discrimination only in the City's enactment of the Ordinance, not its application to Wal-Mart.  Wal-Mart's sixth claim, for declaratory relief, alleges only facial challenges to the Ordinance:

An actual controversy has arisen and now exists
between Wal-Mart . . . and [the City] . . .
relative to their respective rights and duties in
the project in light of the course of conduct
hereinbefore set forth and described.  Wal-Mart
contends [], in view of all attendant facts and
circumstances, [the City] unlawfully *adopted* the
Ordinance.  Wal-Mart asserts [] [the City] cannot
*adopt* the Ordinance because . . . the Ordinance
does not treat similarly situated retailers alike.
Wal-Mart also asserts [] the Ordinance unlawfully
and arbitrarily discriminates against out-of-state
interests and . . . . violates the Commerce Clause.
Wal-Mart further contends the Ordinance is
unconstitutionally vague and uncertain.

Doc. 1, Compl., ¶ 58 (emphasis added).  The complaint solely presents a facial challenge to the Ordinance.

**14**

1  Nor has the City consented, either expressly or by

2  implication, to try Wal-Mart's putative as-applied Ordinance

3  challenges.  Rule 15(b) of the Federal Rules of Civil Procedure

4  provides in relevant part:

5  When issues not raised by the pleadings are tried
   by express or implied consent of the parties, they
6  shall be treated in all respects as if they had
   been raised in the pleadings.

7  Rule 15(b), Fed.R.Civ.P.  *Faustin v. City and County of Denver,*

8  *Colo.*, 423 F.3d 1192 (10th Cir. 2005), held a complaint was

9  impliedly amended to include facial challenges because Defendants

10 never contested the characterization of Plaintiff's developing

11 claims as a facial challenge to Denver's policy during

12 proceedings in the district court.  *Faustin*, 423 F.3d at 1196.

13 Here, the City has consistently objected to and argued Wal-Mart

14 cannot assert an as-applied challenge to the Ordinance.  See Doc.

15 51, Mem. in Supp. of Mot. for Summ. J., 21-24; Doc. 207, Reply to

16 Suppl. Mem. in Opp., 1-6.

17 Wal-Mart relies on *Williams v. Vidmar*, 367 F.Supp.2d 1265

18 (N.D. Cal. 2005), to argue that under federal notice pleading

19 standards, the complaint sufficiently alleges facts to support

20 as-applied challenges to the Ordinance.  Doc. 216, Suppl. Mem. 2d

21 in Opp., 4.  In *Williams*, an elementary-school teacher alleged

22 defendants allowed "similarly situated" teachers to include

23 religious expression in their lessons and supplemental handouts,

24 did not require them to submit their lesson plans and

25 supplemental materials in advance, and did not limit their

26 choices in the same way defendants limited plaintiff's.

27 Plaintiff alleged defendants discriminated against him because of

28

**15**

his religious beliefs in violation of the Equal Protection Clause. *Williams*, 367 F.Supp.2d at 1270. The court rejected defendants' argument that "similarly situated teachers" did not sufficiently identify the class of persons referred to for an equal-protection claim, because the allegation was sufficient to put defendants on notice.

In both *Williams* and *Kiser v. Naperville*, 227 F.Supp.2d 954 (N.D. Ill. 2002), the courts considered the adequacy of notice provided by allegations that a claim had already arisen. Here, Wal-Mart's complaint alleges constitutional deprivations only in the enactment, not application, of the Ordinance. No as-applied claim could be asserted when the complaint was filed, as the City had not taken action on Wal-Mart's application. Wal-Mart could have amended the complaint to assert as-applied claims after May 9, 2005, when the Ordinance was applied to deny Wal-Mart's Supercenter application, but did not. Wal-Mart's complaint does not assert an as-applied challenge to the Ordinance.

2. <u>Wal-Mart's Putative As-Applied Challenge to the Ordinance</u>

a. <u>Ripeness</u>

Even assuming, *arguendo*, an as-applied challenge had been asserted, the City argues Wal-Mart's putative as-applied challenge was not ripe because Wal-Mart did not file a "complete" application for a permit to site a Supercenter in Turlock. Doc. 51, Mem. in Supp. of Mot. for Summ. J., 21-24. On April 15, 2005, Wal-Mart filed a revised Supercenter permit application with the City. Doc. 191, Def.'s RSDF #121. This application was denied on May 9, 2005. *Id.*, Def.'s RSDF #124. The City's

**16**

February 27, 2006, reply to Wal-Mart's supplemental memorandum states the City:

> reserves briefing the issues of ripeness and claim preclusion, as those issues relate to the April 15, 2005, application.  Given [] Wal-Mart has not moved to supplement its complaint to bring facts relating to that application before the [c]ourt, it is premature for the City to attempt to address such claims.  Obviously, the City's March 29, 2005, motion for summary judgment could not and did not address the question of whether City staff's subsequent denial of the April 15, 2005, application rendered Wal-Mart's "as-applied" claims adequately ripe, or whether Wal-Mart should be excused from appealing staff's denial to the Planning Commission or the City Council.

Doc. 207, Reply to Suppl. Mem. in Opp., 5.

Wal-Mart contends the City Planning Manager's denial on May 9, 2005, of Wal-Mart's April 15, 2005, Supercenter permit application, and futility of further pursuit of a Supercenter permit, make ripe its putative as-applied claim.  Doc. 204, Suppl. Mem. in Opp., 3-5.

Ripeness requirements are imposed only on "as-applied" challenges, not to facial challenges.  A constitutional challenge to land use regulations is ripe when a property owner or developer has received the planning commission's final, definitive position regarding how it will apply disputed regulations to the particular land in question.  A final decision by the government agency that inflicts a concrete harm on the landowner is required.  Before a decision is final the landowner must have submitted one formal development plan and sought a variance from any regulations barring development in the proposed plan that have been denied.  *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1232 (9th Cir. 1994).  A landowner may avoid the final

**17**

decision requirement if attempts to comply with that requirement would be futile. *Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9ᵗʰ Cir. 1988). A property owner cannot rely on the futility exception until he or she makes at least one meaningful application. *Id.* The same ripeness standard applies to takings, equal protection, and substantive due process claims. *Id.*

> i.   Denial of Wal-Mart's Supercenter Permit
>      Application

Between January 1, 2003, and January 26, 2005, Wal-Mart did not file any application with the City for any development permit. Doc. 165, Pl.'s RSUF #95. On January 26, 2005, Doucet & Associates, Inc., an engineering firm, filed documents with the City on Wal-Mart's behalf the firm described as "an application for entitlements for a Wal-Mart Supercenter proposed for development in Turlock." Doc. 165, Pl.'s RSUF #96. Defendants claim the application was incomplete in violation of Turlock Municipal Code Section 9-5-102, because it did not include a floor plan, and the City could not determine whether the Ordinance would permit the proposed development. *Id.*, Pl.'s RSUF #97; *see also id.*, Pl.'s RSUF #98 (*citing* City Municipal Code Section 9-5-102: "An application for a permit . . . shall be accompanied by maps, drawings, and data as necessary to evaluate the proposed request for conformance with the General Plan and the provisions of this chapter"). Wal-Mart alleges the January 26, 2005, application "contained all information required in the City's application." *Id.*, Pl.'s RSUF #97 (response).

On April 15, 2005, Wal-Mart filed a revised application with the City. The revised application included revisions of several

**18**

of the documents originally submitted to the City.  Doc. 191,
Def.'s RSDF #121.  City Planning Manager Michael I. Cooke
responded to Plaintiff's April 15, 2005, revised application on
May 9, 2005, by letter, stating the "revised application you
provided contains the information I need to determine how the
[O]rdinance applies to your project."  *Id.*, Def.'s RSDF #123.
Based on the sales floor area figures, the letter states the
project "is defined by [the Ordinance] as a 'Discount
Superstore.'  Therefore, it is prohibited and I am returning your
application fees herewith."  *Id.*, Def.'s RSDF #124.  See Doc.
204, Suppl. Mem. in Opp., 2.

ii.  <u>Futility Exception</u>

The Turlock Municipal Code provides for administrative
review of the City's Supercenter permit denial, and a variance-
application procedure affording administrative review of denials.
Doc. 51, Mem. in Supp. of Mot. for Summ. J., 23.  Turlock
Municipal Code Section 1-4-01 provides:

> Any action or decision of the Planning,
> Development Engineering, or Building and Safety
> Division of Community Development Services may be
> appealed to the Planning Commission.  Any action
> or decision of the Planning Commission may be
> appealed to the City Council.

Cooke Decl., Ex. F, 1.  Wal-Mart did not appeal, to the Planning
Commission or the City Council, the City Planning Manager's
denial of its Supercenter permit application.  It did not seek a
variance to permit the establishment of a Supercenter in Turlock.
Doc. 204, Suppl. Mem. in Opp., 2.  Wal-Mart argues its as-applied
challenge is nonetheless ripe because it was futile either to
appeal the denial or to seek a variance.  Doc. 155, Mem. in Opp.,

**19**

13-14; Doc. 204, Suppl. Mem. in Opp, 5-6.

First, no City decisionmaking body has the authority to permit a Supercenter in Turlock.  Doc. 204, Suppl. Mem. in Opp., 5-6.  It is undisputed Superstores are "completely prohibited within the City of Turlock."  Doc. 191, Def.'s RSDF #127. Second, "the summary judgment record leaves no doubt [] the City of Turlock . . . is dead set against a Superstore in Turlock." Doc. 204, Suppl. Mem. in Opp., 6.  *Hoehne v. County of San Benito*, 870 F.2d 529 (9th Cir. 1989), reviewed the dismissal for lack of ripeness of a suit alleging inverse condemnation and violations of substantive and procedural due process in the county's denial of a development permit.  *Hoehne*, 870 F.2d at 531.  Plaintiffs proposed dividing their sixty-acre parcel into four lots with an average size of fifteen acres per lot, a use which zoning permitted.  *Hoehne*, 870 F.3d at 530.  The county planning commission nonetheless denied the application.  *Hoehne*, 870 F.3d at 531.  Plaintiffs appealed to the county board of supervisors, who affirmed the denial after a closed meeting.  *Id.* The county subsequently amended its general plan land-use designation and zoning maps to impose a forty-acre minimum lot size on the Hoehne's parcel.  *Id.*  The county's motion for summary judgment was granted because the case was not ripe, since the board's decision was not final and plaintiffs had not sought compensation under state law.  *Id.*

The Ninth Circuit reversed, finding the "uncontroverted facts demonstrate [] [the county] had reached a final decision on [plaintiffs'] application . . . .  We are persuaded [] the [c]ounty has drawn the line, clearly and emphatically, as to the

sole use to which [plaintiffs'] parcel may ever be put." *Hoehne*,
870 F.2d at 533.

> It would have . . . been futile for [plaintiffs]
> to seek a conditional use permit or a more
> favorable rezoning because in actually rezoning
> the tract to further restrict development, the
> supervisors themselves sent a clear and, we
> believe, final signal announcing their views as to
> the acceptable use of the property.  [I]t would
> have been futile for [plaintiffs] to seek a
> [g]eneral [p]lan amendment in their favor, because
> the supervisors had amended the [g]eneral [p]lan
> in a manner clearly and unambiguously adverse to
> the application of the landowners.

*Hoehne*, 870 F.2d at 535.

Here, the City amended the Northwest Triangle Specific Plan
by the Ordinance, Doc. 165, Pl.'s RSUF #3, to generally prohibit
discount superstores, and the City admits the Ordinance
absolutely prohibits a Wal-Mart Supercenter in Turlock.  The
Ordinance was enacted in direct response to Wal-Mart's attempt to
establish a Supercenter in Turlock.  This is a "clear and
unambiguous" signal of the City's intention to exclude discount
superstores from Turlock.  *See Hoehne*, 870 F.2d at 535.  Any
appeal by Wal-Mart of City Planning Manager Cooke's denial of the
Supercenter permit application had to be made to the Turlock
Planning Commission and City Council.  Doc. 51, Mem. in Supp. of
Mot. for Summ. J., 23.  The record establishes such an appeal
would be an idle and futile act.  *Id.*

Before the futility exception applies, Wal-Mart was required
to submit at least one application for a variance.  *Manufactured
Home Communities, Inc. v. City of San Jose*, 420 F.3d 1022, 1035

(9th Cir. 2005).[2]

It is undisputed Wal-Mart has not applied to the City for a variance.  Doc. 204, Suppl. Mem. in Opp., 3-9.  Wal-Mart argues it cannot obtain a variance because: (1) variances cannot be granted for a use or activity which is not otherwise expressly authorized by the zoning regulation governing the parcel of property, Doc. 204, Suppl. Mem. in Opp., 5 (*citing* California Government Code Section 65906); and (2) a project must be consistent with any specific plan adopted to further the objectives of a general plan, and here the Northwest Triangle Specific Plan, which the Ordinance amended, prohibits discount Superstores in Turlock, *id.*, 6.

California Government Code Section 65906 provides:

> Variances from the terms of the zoning ordinances shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.
> Any variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized shall not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated.

---

[2] Wal-Mart claims "[t]he futility exception does not require both a rejected development plan and a variance application; it requires only one rejected application."  Doc. 204, Suppl. Mem. in Opp., 3 & n.1 (emphasis omitted) (*citing Herrington v. County of Sonoma*, 834 F.2d 1488, 1496 (9th Cir. 1987) *op. amended and reh'g denied* 857 F.2d 567 (9th Cir. 1988); *Hoehne v. County of San Benito*, 870 F.2d 529, 534-35 (9th Cir. 1989)).  In both *Herrington* and *Hoehne*, the Ninth Circuit excused plaintiffs' failure to apply for a variance because, as here, a variance could not legally be granted.  *Herrington*, 857 F.2d at 569-70 & n.2; *Hoehne*, 870 F.2d at 534-35.

*A variance shall not be granted for a parcel of property which authorizes a use or activity which is not otherwise expressly authorized by the zone regulation governing the parcel of property.* The provisions of this section shall not apply to conditional use permits.

Cal.Gov.Code § 65906 (emphasis added); *see also* Cooke Decl., Ex. A (text of Ordinance 1015-CS), 22 ("'[v]ariance' shall mean a permit which grants a property owner relief from development standards to the zoning regulations of this Code when, because of [a] particular physical or topographical condition of the property, compliance would result in undue hardship to the owner (as distinguished from a mere inconvenience or desire to make more money)").

It is undisputed there are no zoning districts in Turlock where discount superstores are permitted. Doc. 165, Pl.'s RSUF #36; Doc. 191, Def.'s RSDF #128. California Government Code Section 65906 expressly prohibits the City from granting a variance to Wal-Mart for its application, because a discount superstore is not an authorized use under any Turlock zone regulation governing the property. *See Milagra Ridge Partners, Ltd. v. City of Pacifica*, 62 Cal.App.4th 108, 118-19 (1998); *Riggs v. City of Oxnard*, 154 Cal.App.3d 526, 528-29 (1984). Application for a variance is not a legally viable option. *See Herrington*, 857 F.2d at 570; *Hoehne*, 870 F.2d at 535. The futility exception excuses Wal-Mart from applying for a variance. *Herrington*, 857 F.2d at 570 & n.2. It has not been suggested that a conditional use permit could have been obtained.

b.   Exhaustion of State Court Mandamus Review

The City further asserts Wal-Mart's putative as-applied

challenge is not ripe due to Wal-Mart's failure to seek judicial mandamus review of the City's denial of Wal-Mart's application under California Code of Civil Procedure Section 1094.5. Doc. 190, Resp. in Supp., 19; Doc. 204, Suppl. Mem. in Opp., 9.

It is well established Section 1983 has no exhaustion-of-state-remedies requirement. *Edwards v. Balisok*, 520 U.S. 641, 649 (1997); *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982); *American Consumer Pub. Ass'n, Inc. v. Margosian*, 349 F.3d 1122, 1129 (9th Cir. 2003). There is no exhaustion-of-state-remedies requirement for Wal-Mart's equal-protection, Commerce Clause, or due-process challenges under Section 1983.

> c.   Res Judicata Effect of the Denial of Wal-Mart's
>      Application

Wal-Mart's April 15, 2005, revised application to site a Wal-Mart Supercenter in Turlock was denied by the City on May 9, 2005. Doc. 191, Def.'s RSDF ##121, 123, 124. The City argues Wal-Mart's federal causes of action are barred by the res judicata effect of the City's denial of Wal-Mart's application. Doc. 190, Resp. in Supp., 19.

"'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents re-litigation of the same cause of action in a second suit between the same parties or parties in privity with them. 'Collateral estoppel,' or 'issue preclusion,' precludes re-litigation of issues argued and decided in prior proceedings. Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant

**24**

serves as a bar to further litigation of the same cause of action." *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896-97 (2002).

Res judicata may be applied to administrative agency actions when: (1) an administrative agency acts in a judicial capacity; (2) resolves disputed issues of fact properly before it; (3) which the parties have had an adequate opportunity to litigate. *See Public Utility Dist. No. 1 of Snohomish County v. Federal Emergency Management Agency*, 371 F.3d 701, 708 (9th Cir. 2004). If these requirements are satisfied, the federal courts give the state agency's decision the same preclusive effect the decision would have in that state's courts. *Olson v. Morris*, 188 F.3d 1083, 1086 (9th Cir. 1999).

Under California law, failure to challenge an agency's decision rendered in its judicial capacity entitles that decision to preclusive effect in all subsequent actions. *Johnson v. City of Loma Linda*, 24 Cal.4th 61, 69 (2000). An administrative agency decision has collateral estoppel effect when the decision and the agency's prior proceedings possess a judicial character. Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision. *Pacific Lumber Co. v. State Water Resources Control Bd.*, 37 Cal.4th 921, 944 (2006) (citations omitted).

The City Planning Manager was not acting in a quasi-judicial

capacity when he, for the City, denied Wal-Mart's Supercenter permit application without a hearing.  The City Planning Manager denied Wal-Mart's application after considering only the written application materials submitted by Wal-Mart on April 15, 2005. Doc. 191, Def.'s RSDF ##123, 124.  There was no hearing, no testimony, no opportunity to call or examine witnesses, or any other indicia of judicial capacity.  The City's denial of Wal-Mart's application is not entitled to res judicata effect in the federal courts.  *FEMA*, 371 F.3d at 708.  Moreover, the futility exception excuses Wal-Mart's failure to pursue state judicial mandamus.

> d.   Statute of Limitations

The City argues Wal-Mart cannot assert an as-applied challenge to the Ordinance because the limitations period has expired.  Doc. 190, Resp. in Supp., 19; Doc. 207, Reply to Suppl. Mem. in Opp., 4.

The limitations period for Section 1983 challenges to local government ordinances is two years.  *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084, 1085 (9th Cir. 1991) (*citing Wilson v. Garcia*, 471 U.S. 261 (1985)); *Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004) *cert. denied sub nom. Kempton v. Maldonado*, 544 U.S. 968 (2005).  The Ordinance was enacted on December 16, 2003, and January 13, 2004.  Doc. 165, Pl.'s RSUF #1.  The complaint was filed on February 11, 2004.  Wal-Mart's facial and putative as-applied equal-protection and due-process Section 1983 challenges are timely.

The City claims Wal-Mart cannot assert an as-applied Commerce Clause challenge to the Ordinance under Section 1983,

and consequently any as-applied Commerce Clause challenge is barred by California Government Code Section 66499.37, which provides a ninety-day limitations period for as-applied challenges to denial of development permits.  Doc. 207, Reply to Suppl. Mem. in Opp., 4 (*citing Hensler v. City of Glendale*, 8 Cal.4th 1, 21-28 (1991)).  *White Mountain Apache Tribe v. Williams*, 810 F.2d 844 (9th Cir. 1984), cited by the City, states in *dicta* that Commerce Clause challenges cannot be brought under Section 1983.  *Williams*, 810 F.2d at 849 ("[j]ust as the Supremacy Clause does not secure rights within the meaning of [Section] 1983, neither does the Commerce Clause").  However, *Dennis v. Higgins*, 498 U.S. 439 (1991), holds alleged state violations of the Commerce Clause may be challenged under Section 1983.  *Dennis*, 493 U.S. at 440; *Southwest Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1177 (10th Cir. 2001).  If, *arguendo*, the complaint asserts an as-applied Commerce Clause challenge to the Ordinance, the challenge is timely and assertable under Section 1983.

e.   <u>Facial Challenge</u>

The City claims if, *arguendo*, the complaint asserts an as-applied challenge, the outcome of the facial challenge will control the result of the as-applied claim because, as Wal-Mart concedes, the Ordinance left the City no discretion to approve any Supercenter.  Doc. 207, Reply to Suppl. Mem. in Opp., 3.

Wal-Mart states:

> The denial of the Wal-Mart application was based exclusively on the Ordinance, which was intended to bar Wal-Mart from operating a Supercenter in Turlock. *The Ordinance does not permit any discretion. It dictates an outright ban on*

27

*Supercenters*.

Doc. 204, Suppl. Mem. in Opp., 13 (emphasis added); *see also* Doc. 165, Pl.'s RSUF #105.

*Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064 (9th Cir. 2003), holds no as-applied challenge can be asserted where a statute grants no discretion to the administering agency:

> As the district court recognized, this is essentially a facial challenge to the inherently unequal criteria for moving the IPES Line contained in the 1987 Plan.  The 1987 Plan enshrined the differential triggering requirements for the vacant lot equations of California and Nevada; the Agency had no discretion to deviate from the Plan's provisions.  In 1999, the Agency did not apply equal terms unequally – it applied inherently *unequal* terms in equal fashion.  If the Association thought the inequality unlawful, its quarrel was with the terms of the 1987 Plan itself.

*Tahoe Sierra*, 322 F.3d at 1080 n.15; *see also Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 689 (9th Cir. 1993).

The facial challenge subsumes Wal-Mart's putative as-applied challenge as a matter of law, because the Ordinance prohibits the operation of a Wal-Mart Supercenter in Turlock.

B.   Equal Protection Challenge

   1.   Fourteenth Amendment

Wal-Mart argues the Ordinance is unconstitutional on three grounds: (1) it deprives Wal-Mart of the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution, Doc. 155, Mem. in Opp., 11-30; (2) it discriminates against interstate commerce, in violation of Article I, Section 8, Clause 3, of the United States Constitution (the "Commerce

Clause"), *id.*, 31-48; and (3) it is unconstitutionally vague, *id.*, 48-50.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Because the Ordinance involves social and economic policy, and neither targets a suspect class nor impinges on a fundamental right, it is reviewed according to the "rational basis" standard.  *Rui One Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004) (*citing FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).  Under this test, statutes are generally presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.  *Fields v. Legacy Health System*, 413 F.3d 943, 955 (9th Cir. 2005).  A legislative classification under rational basis review must be wholly irrational to violate equal protection.  *Id.*  The challenger bears the burden of negating every conceivable basis which might support the legislative classification, whether or not the basis has a foundation in the record.  *Id.*  A legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.  *Beach Communications*, 508 U.S. at 315.

> a.   Interests Allegedly Served by Ordinance

The City claims as rational bases for the Ordinance: (1) to maintain Turlock's neighborhood shopping area structure set forth

**29**

in Turlock's General Plan, and to avoid (2) increased traffic

impacts and (3) blight that Defendants anticipate a discount

superstore would cause.   Doc. 51, Mem. in Supp. of Mot. for Summ.

J., at 11.

> The City's General Plan calls for small
> neighborhood shopping areas throughout the City
> and larger regional shopping areas on the
> periphery.  The neighborhood shopping areas are
> intended to address the daily shopping needs of
> residents.  The City relies on supermarkets to
> serve as anchor tenants for these neighborhood
> shopping centers.  The neighborhood shopping
> centers are intended to cater to daily shopping
> needs and are located so as to be easily accessed
> by foot or bicycle as well as by car from the
> residential areas.  They are only intended to draw
> their customers from the nearby neighborhoods.
> The large regional shopping areas are intended to
> draw their customers from a much larger area and
> are not intended for daily shopping.  The regional
> shopping areas are intended for big-box retail
> stores, such as Target, Wal-Mart, or Costco, which
> customers will visit [less] frequent[ly].   The
> regional shopping areas are located on the
> periphery of the City, next to State Route 99, to
> provide easier access for customers coming from a
> greater distance, not just from Turlock itself,
> but also from the larger trade area beyond
> Turlock.  The Ordinance furthers these General
> Plan policies.

Cooke Decl., ¶ 4.  The General Plan was adopted in March 1993 and

revised in June 2002.  *Id.*, ¶ 2.  The legislative objectives are

broader than only air quality, traffic, and blight, on which Wal-

Mart's complaint focuses.  The neighborhood shopping areas'

preservation and the encouragement of foot and bicycle traffic

over automobile use are state legislative objectives in the

findings supporting the Ordinance and were recognized by the

state appeals court.  *See Wal-Mart*, 138 Cal.App.4th at 279.

The City's stated concerns about a discount superstore,

which combines general merchandise with an extra-large grocery

store, inside Turlock are that it would: (1) draw customers away from the anchoring neighborhood supermarkets, resulting in chain-reactive urban blight as they succumb to discount superstore competition; (2) cause traffic congestion by increasing traffic flows in streets which were not designed to accommodate high traffic volume; and (3) increase automobile use and air pollution.   Doc. 51, Mem. in Supp. of Mot. for Summ. J., at 7-18.

Various independent studies are cited in the Ordinance's legislative record:

- A study commissioned by the City of Oakland shows the traffic impact of a discount superstore is greater than the traffic impact of a supermarket, a discount club, or a discount store.  It also shows discount superstores cause blight and an increase in air pollution.  Doc. 165, Pl.'s RSUF #68 (admitted only that this study was entered into the record).
- A study by VRPA Technologies, Inc., shows Wal-Mart Supercenters generate 34.5% more vehicle trips than had been previously estimated by the Institute of Transportation Engineers.  *Id.*, Pl.'s RSUF #69 (admitted only that this study was entered into the record).
- A report for the City of Fremont shows discount superstores generate more vehicle trips than discount clubs.  *Id.*, Pl.'s RSUF #70 (admitted only that this study was entered into the record).
- A study by Strategic Economics discusses the store closures and negative effects on the City of Fremont's business district the study stated would be caused by a discount superstore opening in the City of Fremont.  *Id.*, Pl.'s RSUF #71 (admitted only that this study was entered into the record).
- A Contra Costa County study shows discount superstores are likely to cause blight and increased traffic.  *Id.*, Pl.'s RSUF #72 (admitted only that this study was entered into the record).
- A Mississippi State University study discusses the economic impacts of discount superstores on existing businesses.  *Id.*, Pl.'s RSUF #73 (admitted only that this study was entered into the record).
- An Oklahoma City report describes the relationship between urban blight and Wal-Mart Supercenters.  *Id.*, Pl.'s RSUF #74 (admitted only that this study was entered into the record).

31

1

2

• A Business Week article discusses store closures caused by Wal-Mart Supercenters. *Id.*, Pl.'s RSUF #75 (admitted only that this article was entered into the record).

### b.   State Interests Allegedly Served Are Legitimate

Wal-Mart erroneously argues the prevention of urban blight is not a legitimate state interest. Doc. 155, Mem. in Opp., 18. Blight prevention is a legitimate state interest. *Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 (9th Cir. 1993) (Commerce Clause); *Burlington Northern R.R. Co. v. Department of Public Serv. Regulation*, 763 F.2d 1106, 1109 (9th Cir. 1985) ("[t]he standard for judging the constitutionality of a statute . . . which regulates economic activity, is the same under the . . . [E]qual [P]rotection or [C]ommerce [C]lauses"). *See also Cuno v. Daimler-Chrysler, Inc.*, 386 F.3d 738, 748 (6th Cir. 2004) (*citing Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) ("[t]he State has a legitimate interest in local neighborhood preservation, continuity, and stability")). The other interests the City claims the Ordinance promotes are also legitimate state interests. *See Nelson v. City of Selma*, 881 F.2d 836, 839 (9th Cir. 1989) (prevention of traffic congestion); *Dodd v. Hood River County*, 136 F.3d 1219, 1229-30 (9th Cir. 1998) (prevention of air pollution).

Wal-Mart argues the promotion of domestic business within a State, by discriminating against foreign corporations that wish to compete by doing business there, is not a legitimate state purpose. Doc. 155, Mem. in Opp., 18 (*citing Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985)). Turlock's Ordinance does not discriminate against foreign corporations. No retailer,

whether local or foreign, can site a discount superstore in Turlock.  Discount superstores, without regard to the identity of their owners or operators, are prohibited within Turlock.

c.    The Ordinance is Rationally Related to Legitimate State Interests

Wal-Mart questions the rationality of the relationship between the Ordinance and its claimed purposes:

> The City's explanation for the cause of blight or decay is erroneous.  The City has it backwards.  "Blight" is not caused by new development; rather, blight results from economic and community deficiencies which have resulted in a decline in employment, income, and wealth.  The resulting loss of consumer demand can result in failures of neighborhood businesses, which may result in under-maintained or vacant buildings if appropriate re-tenanting does not occur.  In short, losses of community vitality, and not any commerical "use," cause blight.

Doc. 155, Mem. in Opp., 19.

It is well established a legislative choice is not subject to courtroom fact-finding on rational-basis review, and may be based on rational speculation unsupported by evidence or empirical data.  Judicial review is at an end once the court identifies a plausible basis on which the legislature may have relied.  *Rui One Corp.*, 371 F.3d at 1155; *accord*, *SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662, 680 (9th Cir. 2002); *Jackson Water Works, Inc. v. Public Utilities Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986) ("[a]ll that is needed to uphold the state's classification scheme is to find that there are 'plausible,' 'arguable,' or 'conceivable' reasons which may have been the basis for the distinction"); *Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport*

*Authority*, 825 F.2d 367, 370 (11th Cir. 1987) ("the federal courts do not sit as arbiters of the wisdom or utility" of economic legislation) (*citing Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469 (1981)).

Wal-Mart argues the Ordinance's distinctions between discount superstores, which are prohibited, and other retail formats bears no rational relation to any legitimate interest, and for that reason the Ordinance is invalid.  Doc. 155, Mem. in Opp., at 19-27.  According to Wal-Mart, the City has not offered a rational explanation of how the Ordinance's distinctions advance the City's stated goals of maintaining neighborhood shopping areas and proper traffic flows, and minimizing air pollution and urban blight.  *Id.*, 20.  "[T]he City must provide a rational basis for differentiating between Discount Superstores and other permitted uses."  *Id.*

The City sets forth its rational basis for the Ordinance's distinctions in the memorandum in support of its motion for summary judgment:

> [S]tudies in the legislative record showed []
> Discount Superstores cause more traffic than
> Discount Stores, Discount Clubs, or supermarkets,
> and this provides a rational basis for prohibiting
> them.  There was evidence in the record that
> people shop for groceries 2-3 times a week – more
> often than they visit a Discount Store or a
> Discount Club. [citation] Although Discount Clubs
> sell groceries, because they sell in bulk, the
> number of customer trips is less. [citation]
> Although Supermarkets are similar to Discount
> Superstores in that they generate more trips per
> week than Discount Stores and Discount Clubs, they
> do not attract customers from as large a trade
> area as Discount Superstores, which because of
> their size and the synergy between their
> supermarket and discount store components draw
> customers from a larger area and therefore cause
> more vehicle miles to be driven. [citation] This

**34**

increased traffic also causes more air pollution. [citation] [¶] The record also included evidence that competition from a Discount Superstore would threaten the viability of existing neighborhood centers by causing the closure of the supermarkets that anchor those centers, thereby causing blight. This also provides a rational basis for prohibiting Discount Superstores. [citations] With regard to Turlock specifically, the City Council received information that one Discount Superstore opening in Turlock would likely cause two or three supermarkets to close. [citation] This would mean two or three neighborhood shopping centers would lose their anchors and those shopping centers would then likely slip into decay.

Doc. 51, Mem. in Supp., 26-27; *see also id.*, 11-13 (*quoting* Ordinance Preamble), 13-18 (*quoting* legislative record).

The City summarizes its offered rational basis again in its response in support of the motion for summary judgment:

Evidence in the record shows [] people shop for groceries two or three times a week, more frequently than they shop at Discount Stores (which do not have groceries) or Discount Clubs (which sell items in bulk and are therefore visited less frequently).  For this reason, Discount Stores and Discount Clubs cause less traffic and less air pollution than Discount Superstores [citing Doc. 51, Mem. in Supp., 26]. Evidence in the record also shows [] although supermarkets attract customers with the same frequency as a Discount Superstore (each customer shopping two to three times per week), a Discount Superstore, because of the synergy between its supermarket and Discount Store components, draws customers from over a greater distance, thereby resulting in more vehicle miles being driven for each visit, and thereby generating more traffic and the attendant air pollution than a supermarket. [citing id.] This rationale also distinguishes a Discount Superstore from a supermarket in a shopping center. [¶]  Moreover, because a Discount Superstore draws its customers from over large distances, and therefore would draw grocery shoppers from all over the City in a way [] a regular supermarket would not (thereby altering local commute patterns), a Discount Superstore would threaten the viability of the neighborhood shopping centers that are the core of the City of Turlock's General Plan.  Extensive evidence in the record, including evidence of the

35

actual experiences of other communities, showed []
for each Discount Superstore that opens, two or
three supermarkets close.  Such closures would
threaten the survival of the neighborhood shopping
centers anchored by those supermarkets and would
lead to urban blight.  The other classifications
do not have this effect.  Other supermarkets (or
shopping centers with supermarkets) do not have
this effect because they do not draw customers
over such large distances and therefore would not
draw customers from more distant supermarkets.
Discount Stores do not have this effect because
they would not draw grocery shoppers away from the
neighborhood-serving supermarkets.  And Discount
Clubs do not have this effect because they sell in
bulk, making them an occasional destination for a
household, and not one that would replace the two
to three shopping trips made on a weekly basis for
groceries.

Doc. 190, Resp. in Supp., 3-4.

It is well established a legislative choice is not subject
to courtroom fact-finding on rational-basis review, and may be
based on rational speculation unsupported by evidence or
empirical data.  Judicial review is at an end once the court
identifies a plausible basis on which the legislature may have
relied.  *Rui One Corp.*, 371 F.3d at 1155; *accord*, *SeaRiver
Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662, 680
(9th Cir. 2002).  The City's offered basis for the Ordinance's
distinctions is rational.

Wal-Mart vigorously disputes the City's rationale for
discount superstores' adverse impacts on neighborhood centers,
traffic, and air quality.  Doc. 155, Mem. in Opp., 21-22.  Wal-
Mart questions the City's interpretation of and reliance on the
ITE manual in drafting the Ordinance.  *Id.*, 21.  Inquiry into the
basis of a legislative choice is sharply limited on rational-
basis review.  Rational-basis review in equal-protection analysis
is not a license for courts to judge the wisdom, fairness, or

logic of legislative choices. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (*citing FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).  Because the court is not a super-legislature that sits in judgment of the wisdom or desirability of legislative policy, there is a strong presumption that governmental classifications do not violate the Equal Protection Clause unless they burden a suspect class or a fundamental interest.  *McQueary v. Blodgett*, 924 F.2d 829, 835 n.7 (9th Cir. 1991) (*citing City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).  Rational-basis review does not require the government's action actually advance its stated purposes, but merely that the government could have had a legitimate reason for acting as it did*.  Currier v. Potter*, 379 F.3d 716, 732 (9th Cir. 2004).  Here, the City's legislative objectives are lawful, legitimate, and protectable under the law.  The prohibition of discount superstores as the means of achieving the state legislative objective is not irrational.

            d.   Allegedly Improper Legislative Motives

    Wal-Mart further alleges the Ordinance resulted from collusion between local economic interests (owners of the neighborhood grocery stores and union representatives of those who worked in them) and the Council, acting with the improper legislative motive of protecting local merchants and unions from Wal-Mart's "foreign" competition.  Doc. 155, Mem. in Opp., at 17.  Wal-Mart alleges Council members opposed Wal-Mart's plans only after the Council met with Wal-Mart's competitors, and shortly afterwards drafted and passed the Ordinance.  *Id.*, 2-11; *see Wal-Mart*, 138 Cal.App.4th at 302 ("[t]he record demonstrates . . .

that Wal-Mart's prospective competitors, and some of its detractors, . . . lobb[ied] City officials regarding enactment of the Ordinance"). Even an improper motive, without more, does not affect constitutional review of legislation:

> According to the Supreme Court, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications*, 508 U.S. at 315. The First Circuit has specifically rejected a claim that an environmental ordinance violated the Equal Protection Clause because its challengers alleged that its passage was motivated by a desire to restrict a business's power in dealing with unions.

*Rui One Corp.*, 371 F.3d at 1155 (*citing Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 485 (1st Cir. 1991)).

In *International Paper*, a paper company sued to invalidate and enjoin enforcement of a municipal ordinance regulating emission of pollutants by industries and businesses, including plaintiff. *Int'l Paper*, 928 F.2d at 481-82. The company argued the ordinance unduly restricted its bargaining power in a labor dispute with striking unions. *Int'l Paper*, 928 F.2d at 482. The town's board of selectmen, most of whom were striking union employees, authorized the drafting of the ordinance, and proposed it be put to a public referendum, and it passed. *Id.* After ruling the ordinance was a facially valid exercise of the town's power to enact economic legislation, the court refused to "delve into the motivations of the Board members who proposed and drafted the [o]rdinance":

> [W]hile courts may look to legislators' motives where a suspect or quasi-suspect classification is subjected to discrimination or a fundamental right is infringed [citations], absent these circumstances, we will not strike down an

38

otherwise constitutional statute on the basis of
an alleged illicit legislative motive.

*Int'l Paper*, 928 F.2d at 485.

> Zoning law cannot be used solely to safeguard
> local merchants against competition from new
> development.  But it is also axiomatic that
> reviewing courts regard legislative motive as
> irrelevant except in cases of heightened scrutiny,
> usually involving allegations of discrimination
> based on race, gender, or ethnicity.  In all other
> situations, there are good reasons why courts
> should ignore legislative motives.  The motives of
> official decision-makers are seldom clearly
> discernible and could often be easily hidden or
> disguised.  Most telling of all, to speak of the
> "motives" of a legislative body is to attribute
> human characteristics to an inanimate construct,
> the body politic.  It has no motives because it is
> not a person.

George Lefcoe, *The Regulation of Superstores: The Legality of
Zoning Ordinances Emerging from the Skirmishes Between Wal-Mart
and the United Food and Commercial Workers Union*, 58 Ark. L. Rev.
833, 861 (2006).

Here, the Ordinance neither discriminates on the basis of a
suspect or quasi-suspect classification, nor infringes on a
fundamental right.  The Ordinance is rationally related to the
legitimate state interests of preventing traffic congestion and
urban blight, and minimizing air pollution.  The Ordinance does
not violate the Equal Protection Clause of the Fourteenth
Amendment.

2.   California Constitution

Wal-Mart also invokes the Equal Protection Clause of Article
I, Section 7, of the California Constitution.

When the California Supreme Court interprets a provision of
the California Constitution that is similar to a provision of the
United States Constitution, it does not depart from the United

States Supreme Court's construction of the similar federal provision unless given cogent reasons to do so. *Edelstein v. City and County of San Francisco*, 29 Cal.4th 164, 168 (2002). The standard of review under the California Constitution's Equal Protection Clause is the same as that under the United States Constitution's Equal Protection Clause. *See Manduley v. Superior Court*, 27 Cal.4th 537, 572 (2002); *Kasler v. Lockyer*, 23 Cal.4th 472, 481-82 (2000).  The Ordinance is valid under the California Constitution's Equal Protection Clause for the same reasons it is valid under the United States Constitution's Equal Protection Clause.

Wal-Mart argues *Hernandez v. City of Hanford*, 137 Cal.App.4th 1397 (2006), supports its argument that there was no rational basis for the Ordinance's distinction between discount superstores and equivalent multi-tenant developments. *Hernandez* held a zoning amendment that allowed department stores over a certain size to sell furniture on a limited basis while prohibiting furniture sales by smaller retailers violated the smaller retailers' equal protection rights.  The disparate treatment of the retailers was not rationally related to the purpose of the amendment. *Hernandez*, 137 Cal.App.4th at —.  The recent state court *Wal-Mart* decision distinguished *Hernandez* for the reason that "the Ordinance is reasonably related to furthering a legitimate policy choice for organizing development within [the] City." *Wal-Mart*, 138 Cal.App.4th at 303 n.25.  The fact that "no equal protection claim [was] raised in this case" was "[a] less important difference." *Id.*  Here, all are equally enjoined from establishing a discount superstore in Turlock.  No

**40**

valid equal-protection concern is here presented under the state or federal Constitutions.

C.   <u>Commerce Clause</u>

The Commerce Clause of the United States Constitution provides, in relevant part:

> Congress shall have Power ... [t]o regulate Commerce ... among the several States.

U.S. Const. Art. I., § 8, cl. 3.   Congress's authority to regulate commerce pursuant to the Constitution prohibits the states from enacting laws which impede the flow of interstate commerce.   *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (*citing Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 318 (1852)). This authority, known as the dormant Commerce Clause, provides protection from state legislation inimical to the national commerce even where Congress has not acted.   *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 310 (1994).   The dormant Commerce Clause "limits the power of the States to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991).   This limitation on state power is not absolute. In the absence of conflicting federal legislation, the states retain authority under their general police powers to regulate matters of legitimate local concern, although interstate commerce may be affected.   *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980); *Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005).   The Commerce Clause applies to the actions of municipalities as well as to those of states.   *On The Green Apartments LLC v. City of Tacoma*, 241 F.3d 1235, 1238 (9th Cir. 2001).

**41**

In reviewing challenges to local regulations under the Commerce Clause, the Ninth Circuit follows a two-tiered approach:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*S. D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001) (*citing Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)).[3]

1.  First-Tier Scrutiny: Facial Discrimination Against Interstate Commerce

    a.  *Exxon*

The City relies chiefly on *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), to argue the Ordinance does not discriminate either facially or in effect against interstate commerce.  There, a Maryland statute provided a producer or

---

[3] Professor Tribe summarizes Commerce Clause analysis as follows:

> [A] state law must, in the first instance, concern a legitimate state end.  Second, even if they have a legitimate aim, state regulations that discriminate against interstate or out-of-state commerce are subject to rigorous scrutiny that approaches *per se* invalidity.  Finally, even if a regulation does not discriminate against interstate commerce, it must be struck down if the burden it imposes on interstate commerce is clearly excessive in relation to the putative local benefits.

1 Laurence H. Tribe, American Constitutional Law § 6-5, pp. 1050-51 (3d ed. 1999) (citations and internal quotation marks omitted).

refiner of petroleum products could not also operate a retail service station within the state, and had to extend all "voluntary allowances" uniformly to all service stations it supplied. *Exxon*, 437 U.S. at 119-120.  Among other claims, plaintiff asserted the statute violated the Commerce Clause in three ways: it discriminated against interstate commerce; it unduly burdened interstate commerce; and it imposed controls on a commercial activity that is not amenable to state regulation. *Exxon*, 437 U.S. at 120, 125.

The Court rejected these arguments.  First, it held the Maryland statute "plainly" did not discriminate against interstate goods or favor local producers or refiners:

> [T]he Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce.

*Exxon*, 437 U.S. at 126.

Like the Maryland statute in *Exxon*, Turlock's Ordinance does not erect barriers against interstate commerce.  The Ordinance prevents any retailer, whether in-state or out-of-state, from establishing the discount superstore marketing format in Turlock. *See Wal-Mart*, 138 Cal.App.4th at 302 ("[t]he Ordinance does not single out Wal-Mart but, instead, prohibits all discount superstores within [the] City's boundaries").  This leaves the market open to all local or foreign retailers of all local or foreign products, except in the discount superstore format.  The Commerce Clause does not protect the particular structure or

**43**

methods of operation of a retail market.  *Exxon*, 437 U.S. at 127.
Nor does it "give an interstate business the right to conduct its
business in what it considers the most efficient manner," for
"the Constitution protects the interstate market, not particular
interstate firms."  *Valley Bank of Nevada v. Plus System, Inc.*,
914 F.2d 1186, 1193 (9th Cir. 1990) (*citing Exxon*, 437 U.S. at
127-128).

The Ordinance does not discriminate against interstate
commerce because any retailer can locate and do business in
Turlock, with any employees or managers, offering any products,
except in the legislatively defined discount superstore format.
There is no constitutional right to do business in a retailer's
optimally profitable store configuration, if the resulting
operation burdens environmental, traffic-pattern, economic-
viability, and land-use-planning interests of the host
municipality.  There is no suggestion any out-of-state retailer
cannot successfully do business marketing out-of-state goods in
Turlock if it is not permitted to do so as a discount superstore.

Wal-Mart disputes the City's interpretation of *Exxon*,
arguing such a result is contrary to the holding in *Hunt v.
Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977).  Doc.
155, Mem. in Opp., 33.  *Exxon* distinguished *Hunt* on the grounds
that, in *Hunt*, "the challenged state statute raised the cost of
doing business for out-of-state dealers" in relation to those
from within the state, and "in various other ways, favored the
in-state dealer in the local market."  *Exxon*, 437 U.S. at 126.
Here, the Ordinance deals evenhandedly with in-state and out-of-
state retailers: none may establish a discount superstore in

**44**

Turlock. *See Valley Bank*, 914 F.2d at 1193 ("[a]n [a]ct that applies evenhandedly certainly passes muster under the [C]ommerce [C]lause"). Wal-Mart provides no evidence to show doing business in its non-discount superstore formats is more costly or burdensome than the expense of doing business incurred by other discount and grocery retailers in Turlock, or is otherwise discriminatory against out-of-state businesses. *Compare Hunt*, 432 U.S. at 351.

### b.   Intention versus Effect

Wal-Mart contends *Exxon* holds a statute violates the Commerce Clause if it discriminates against interstate commerce in either intention or effect. Doc. 155, Mem. in Opp., at 32. This overstates *Exxon*'s holding, which focused on the effects of the statute, not the alleged motives of those who enacted it. *Exxon*, 437 U.S. at 125-128; *see also Healy v. Beer Institute*, 491 U.S. 324, 336 (1989) ("critical inquiry" is whether the practical effect of the regulation is to control conduct beyond boundaries of state); *Associated Industries of Missouri v. Lohman*, 511 U.S. 641, 654-655 (1994) (Commerce Clause analysis focuses on whether the challenged statute is discriminatory in effect); *Gerling Global Reinsurance Corp. of America v. Low*, 240 F.3d 739, 746 (9th Cir. 2001) (Commerce Clause seeks to prevent extraterritorial economic effects, not purposes). *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 (1st Cir. 2005) notes:

> there is some reason to question whether a showing
> of discriminatory purpose alone will invariably
> suffice to support a finding of constitutional
> invalidity under the dormant Commerce Clause. *See*
> Kathleen M. Sullivan & Gerald Gunther,
> Constitutional Law 275 (15th ed. 2004)
> (recognizing the analytical difficulty that arises

**45**

1
2

> because "a law motivated wholly by protectionist
> intent might fail to produce significant
> discriminatory effects").

3
4
5
6
7
8
9
10
11
12
13
14

*Gwadosky*, 430 F.3d at 36 n.3; *see also United States v. O'Brien*, 391 U.S. 367, 383 (1968) (effects, not motives, determine whether an exercise of legislative power is constitutional); *Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (same); Note, 119 Harv. L. Rev. 258, 265-66 (2005) (focus on legislative motives unique to Establishment Clause jurisprudence); Susan E. Stokes & Christy Anderson Brekken, *The Eighth Circuit Grants Corporate Interests a New Weapon Against State Regulation in* South Dakota Farm Bureau v. Hazeltine, 49 S.D. L. Rev. 795, 800-801 (2003-2004) ("[t]he Supreme Court and Eighth Circuit have stated in *dicta* that a discriminatory purpose can trigger strict scrutiny, but in no case has discriminatory purpose alone been sufficient").

15
16
17
18

   In no Commerce Clause case cited or disclosed by research has a statute or regulation been invalidated solely because of the legislators' alleged discriminatory motives.  For example, in *Bacchus Imports* the Court stated:

19
20

> A finding that state legislation constitutes
> "economic protectionism" may be made on the basis
> of either discriminatory purpose or discriminatory
> effect[.]

21
22
23
24
25
26
27

*Bacchus Imports*, 468 U.S. at 270 (citations omitted).  However, the *Bacchus Imports* Court did not hold the statute was unconstitutional solely because of its intended purpose: "[l]ikewise, the effect of the exemption is clearly discriminatory[.]"  *Bacchus Imports*, 468 U.S. at 271.  *Bacchus Imports* cited *Hunt* for the proposition that a state statute may be invalidated based on its apparent purpose.  *Bacchus Imports*,

28

**46**

468 U.S. at 270.   However, *Hunt* does not stand for the proposition that alleged discriminatory purpose alone will invalidate a statute.  *See Hunt*, 432 U.S. 333, 351 (1977) ("[a]s the [d]istrict [c]ourt correctly found, the challenged statute has the *practical effect* of not only burdening interstate sales of Washington apples, but also discriminating against them") (emphasis added).

### c.   Practical Effect

The Ordinance is facially neutral.   No retailer, whether in-state or out-of-state, can establish a discount superstore in Turlock.

### i.   The Ordinance Does not Prohibit Any Retailer's Operations

Wal-Mart argues the Ordinance discriminates against interstate commerce in practical effect because "only out-of-state companies, such as [P]laintiffs, are affected by the Ordinance," and the Ordinance "prohibits the operations" of out-of-state businesses like Wal-Mart.  Doc. 155, Mem. in Opp, at 45. This is not true; here, no company, whether in-state or out-of-state, can establish a discount superstore in Turlock.   The Ordinance does not prohibit any local or foreign retailer from selling any local or foreign goods using any marketing format other than the discount superstore.   The Commerce Clause does not protect retail formats.  *Exxon*, 437 U.S. at 127.   Wal-Mart continues to operate a Wal-Mart store in Turlock.  Doc. 165, Pl.'s RSUF #101.

### ii.  Disparate Impact

Wal-Mart argues the Ordinance discriminates against

**47**

interstate commerce in practical effect because:

> Only Wal-Mart, K-Mart, and Target have specific
> formats consisting of stores in excess of 100,000
> square feet of gross floor area with more than 5%
> of the sales floor area devoted to the sale of
> non-taxable merchandi[s]e.  Importantly, none of
> the above retailers [is] incorporated within the
> State of California, or maintain their princip[al]
> place of business within the State.  In contrast,
> the four local supermarkets which the Ordinance
> seeks to protect . . . are all local, California
> companies.  All four supermarket operators
> maintain their princip[al] place of business only
> a short distance from Turlock.  The Ordinance
> therefore has no effect on existing local grocers,
> while the only interests burdened are located
> out[]of[]state.

Doc. 155, Mem. in Opp., 44-45.  An analogous argument was

rejected in *Exxon*:

> No facial inequality exists; [Sections] (b) and
> (c) preclude all refiners and producers from
> marketing gasoline at the retail level.  But given
> the structure of the retail gasoline market in
> Maryland, the effect of [Sections] (b) and (c) is
> to exclude a class of predominantly out-of-state
> gasoline retailers while providing protection from
> competition to a class of nonintegrated retailers
> that is overwhelmingly composed of local
> businessmen.

*Exxon*, 437 U.S. at 137 (Blackmun, J., dissenting).  Wal-Mart's

argument that the Ordinance can be invalidated because of the

Council's alleged discriminatory motives, Doc. 155, Mem. in Opp.,

46, has already been rejected.

### iii. Discrimination Against Goods in Interstate Commerce

Wal-Mart argues the Ordinance discriminates against

interstate commerce in practical effect because "the evidence

demonstrates [] the Ordinance was enacted to protect local

producers and suppliers of goods from having to compete with out-

of-state goods sold by Wal-Mart.  For example, Councilperson

**48**

Lazar testified [] he saw it as a 'negative' that, unlike locally based supermarkets, the suppliers to Wal-Mart would not be local, and that 'Wal-Mart ships everything in from other communities.'" *Id.*, 37, 48 (poultry).  No evidence is furnished to show that retail marketing format affects wholesale or retail poultry prices in a way that discriminates against out-of-state producers.  No evidence is offered to show Wal-Mart's national scope and size afford it any less purchasing power to obtain advantageous wholesale prices from in- or out-of-state producers or suppliers of poultry or any other products, that are not explained by market forces having nothing to do with the marketing format in which Wal-Mart operates in a given community. The Ordinance does not prevent Wal-Mart from acquiring poultry products or goods from anywhere in the United States or abroad at the best prices obtainable.

*Exxon* holds:

> If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market – as in *Hunt* [*v. Washington State Apple Advertising Comm'n*], 432 U.S. [333,] 347 [] and *Dean Milk* [*Co. v. City of Madison*], 340 U.S. [349,] 354 [] – the regulation may have a discriminatory effect on interstate commerce.

*Exxon*, 437 U.S. at 126 n.16.

In *Hunt*, a North Carolina statute required all closed containers of apples sold, offered for sale, or shipped into the state to bear "no grade other than the applicable U.S. grade or standard." *Hunt*, 432 U.S. at 335.  The statute effectively prohibited the display of Washington State apple grades on containers of apples originating in Washington State.  *Id.*

**49**

Washington State's grading system was "the equivalent of, or superior to," the grades and standards adopted by the United States Department of Agriculture, due to "a stringent, mandatory inspection program, administered by [Washington State's] Department of Agriculture." *Hunt*, 432 U.S. at 336.  The Court found the statute had "the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them." *Hunt*, 432 U.S. at 350.  The statute accomplished this in three ways: (1) it raised the Washington apple growers' costs of doing business in North Carolina relative to their North Carolina counterparts' by forcing the Washington apple growers to alter their packaging in order to sell in North Carolina, something no North Carolina apple grower had to do, *Hunt*, 432 U.S. at 351; (2) it "stripp[ed] away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system," *id.*; and (3) it allowed inferior North Carolina apples to be placed in the same category with superior Washington apples, and "[s]uch downgrading offers the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit," *Hunt*, 432 U.S. at 352.  All these effects would have reduced the share of Washington apples in the North Carolina market.  *Hunt*, 432 U.S. at 347; *Exxon*, 437 U.S. at 126 n.16.

Like the Maryland statute in *Exxon*, and unlike the North Carolina statute in *Hunt*, Turlock's Ordinance does not increase the cost of doing business for out-of-state businesses relative to their local competitors.  *See Exxon*, 437 U.S. at 126

**50**

(distinguishing *Hunt*).  The Ordinance does not impose added costs on Wal-Mart, or any other out-of-state retailer, to establish a retail outlet in Turlock.  The statute does not downgrade or discriminate against any out-of-state product.  Nor does the Ordinance by its own operation have any effect on the share of local goods compared with out-of-state goods in the local market: even if, *arguendo*, Wal-Mart Supercenters are stocked with more out-of-state goods than are Wal-Mart's other retail formats, this is Wal-Mart's choice, and is not dictated by the Ordinance.  *Id.*

In *Dean Milk*, the Court struck down a Madison, Wisconsin, ordinance that prohibited the sale within the city of pasteurized milk unless bottled at an approved pasteurization plant five miles or less from Madison's central square.  *Dean Milk*, 340 U.S. at 350, 353.  The ordinance effectively prevented plaintiff, an Illinois milk distributor, from selling milk in Madison.  *Dean Milk*, 340 U.S. at 352.  The Court held:

> In thus erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce.

*Dean Milk*, 340 U.S. at 354.

Here, the Turlock Ordinance erects no "economic barrier" against out-of-state goods.  The Ordinance does not prohibit Wal-Mart from stocking its existing Turlock discount store with goods from anywhere in the world.  The Ordinance does not limit Wal-Mart's choice of producers, processors, or suppliers.

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992), abrogated an Oklahoma law requiring in-state coal-fired electric generating plants to burn a mixture including at least ten percent Oklahoma-

**51**

mined coal. *Wyoming*, 502 U.S. at 455:

> [T]he Act expressly reserves a segment of the
> Oklahoma coal market for Oklahoma-mined coal, to
> the exclusion of coal mined in other States.  Such
> a preference for coal from domestic sources cannot
> be characterized as anything other than
> protectionist and discriminatory, for the Act
> purports to exclude coal mined in other States
> based solely on its origin.

*Id.*  The Turlock Ordinance does not set a minimum quantity of in-
state or local goods in Wal-Mart's Turlock stores.  The Ordinance
does not prohibit Wal-Mart from supplying the discount store it
currently operates in Turlock entirely from out-of-state
suppliers, nor require all or any portion of goods stocked for
sale to be in-state.  The Ordinance does not discriminate against
the movement of goods in interstate commerce.

              iv.  Heightened Costs for Out-of-State Operators

     *Atlantic Prince, Ltd. v. Jorling*, 710 F.Supp 893 (E.D. N.Y.
1989), cited by Wal-Mart, Doc. 155, Mem. in Opp., 36, held
unlawful a New York statute that prohibited commercial fishing in
vessels which were longer than ninety feet.  *Atlantic Prince*, 710
F.Supp. at 894.  The statute was "clearly neutral on its face,"
but nevertheless failed first-tier scrutiny because it
discriminated against interstate commerce in "practical effect."
*Atlantic Prince*, 710 F.Supp. at 895-96.

     Like the City, the State argued its legislation was not
discriminatory because it applied evenhandedly to all: the
statute "prohibit[ed] all commercial fishers, regardless of state

origin, from using boats over 90 feet long to catch food fish in New York waters." *Atlantic Prince*, 710 F.Supp. at 895.  The court found, however, the statute was discriminatory in practical effect, because it "b[ore] disproportionately . . . on out-of-state fishers." *Atlantic Prince*, 710 F.Supp. at 896 (*citing Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 675-76 (1981)):

> At the time [the statute] was enacted . . . there was, at most, only one New York commercial fishing vessel exceeding 90 feet in length. [citation] In contrast, this year the [administering state agency] has received [] applications for New York fishing licenses from ten out-of-state vessels over 90 feet in length (including plaintiff's).

*Atlantic Prince*, 710 F.Supp. at 897.  The ultimate effect was to keep larger out-of-state fishing boats out of New York waters, while permitting all but one New York commercial fishing boats to operate.

Unlike the New York statute, the Turlock Ordinance does not deny out-of-state interests (as Wal-Mart claims it is, Doc. 155, Mem. in Opp., 38-40) access to Turlock's market.  *See Ampro Fisheries, Inc. v. Yaskin*, 606 A.2d 1099, 1105 (N.J. 1992) (distinguishing *Atlantic Prince*).  Owners of fishing vessels more than ninety feet long had to purchase smaller boats or be excluded from New York waters.  This cost fell disproportionately on out-of-state interests, because all New York fishing boats, except one, were smaller than ninety feet long.  *See Exxon*, 437 U.S. at 126.  By contrast, although evidence submitted shows that only Wal-Mart and Super K-Mart use the discount superstore format as defined by the Ordinance, Wal-Mart now operates, and both merchants are free to operate, in discount and smaller retail

**53**

formats.  Here, the Ordinance does not impose any extra cost on out-of-state interests.  Wal-Mart has not established a discount superstore in Turlock that the Ordinance will shut down; Wal-Mart already operates a discount store in Turlock.  There is no evidence Wal-Mart's discount store is not profitable, or that the Ordinance will in any way interfere with its continued successful operation.  Wal-Mart does not show it cannot successfully operate in any format except as a discount superstore.  The Ordinance prevents Wal-Mart from using its favored retail format in Turlock; all other formats remain available to it.  *See Exxon*, 437 U.S. at 127; *Valley Bank*, 914 F.2d at 1193.  The Ordinance does not discriminate against interstate commerce either facially or in practical effect.

> 2.  <u>Second-Tier Scrutiny: *Pike*</u>

Wal-Mart argues, Doc. 155, Mem. in Opp., 46, there is a triable issue of fact under the second tier of Commerce Clause analysis:

> When . . . a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*S. D. Myers, Inc.*, 253 F.3d at 466.  This balancing test was first set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Under *Pike*, if a legitimate local purpose is found, then the question becomes one of degree.  The extent of the burden that will be tolerated depends on the nature of the local interest involved.  Even in dormant Commerce Clause analysis, however, the Supreme Court has frequently admonished courts should not second-guess the empirical judgments of lawmakers

concerning the utility of legislation.  For a facially neutral statute to violate the Commerce Clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational. *S.D. Myers, Inc.*, 253 F.3d at 471.  A challenge to the legislative judgment must establish that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker. *Spoklie*, 411 F.3d at 1059 (*quoting Minnesota v. Clover Leaf Creamery, Inc.*, 449 U.S. 456, 464 (1981)).

Here, the Ordinance's putative benefits – avoidance of traffic congestion, prevention of urban blight, minimization of air pollution, and preservation of land-use objectives as to location and character of economic zones within Turlock – are not so outweighed by any burden on interstate commerce as to render the Ordinance unreasonable or irrational.  Wal-Mart has provided nothing to suggest the Ordinance imposes any disparate or other burden upon interstate commerce.

Wal-Mart cites *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005).  Doc. 155, Mem. in Opp., 34.  In *Walgreen*, plaintiff challenged a Puerto Rico law requiring pharmacies to obtain a "certificate of need" prior to opening a new pharmacy. *Walgreen*, 405 F.3d at 52-53.  Once an applicant applied to the Secretary of Health for a certificate, notice of the new pharmacy's application had to be sent to all "affected persons," including existing pharmacies within a one-mile radius of the new store. Existing pharmacies regularly objected to the proposed stores, which, by virtue of simply filing an objection, could hold up the

**55**

development of the new stores for years.  *Walgreen*, 405 F.3d at 53-54.  This legislation violated the Commerce Clause by discriminating against interstate commerce in purpose and effect. The court rejected Puerto Rico's argument that the law applied neutrally to both in-state and out-of-state companies.  *Walgreen*, 405 F.3d at 56-58.  The legislature exempted existing pharmacies when it enacted the statute in 1979.  At that time, 92% of existing pharmacies were locally owned, compared with 94% in 2001.  Additionally,

> [o]ver fifty percent of out-of-Commonwealth entities have been forced to undergo the entire administrative process compared to less than twenty-five percent of local applicants.  Of those applicants forced to endure the hearing process, the Secretary has granted certificates to ninety percent of the local applicants but only to fifty-eight percent of out-of-Commonwealth applicants.

*Id.*  The court also found, "in practice, the Act permits an existing pharmacy to object simply because it fears additional competition."  *Id.*

In *Walgreen*, evidence showed the Act favored local pharmacies over out-of-Commonwealth pharmacies: the great majority of local pharmacies were locally owned, and so any competition seeking market entry was likely to be from outside Puerto Rico; and the Act's procedural obstacles to market entry operated most often against foreign applicants.  Here, the Ordinance treats all retailers the same, whether they are foreign or local: none may establish a discount superstore in Turlock. Foreign companies whose sole business was operating pharmacies were prevented by the Act from doing so in Puerto Rico.  Here, the Ordinance does not prohibit Wal-Mart or any other retailer

from operating in Turlock in any retail format other than the
discount superstore; unlike the Puerto Rico Act, the Ordinance
does not protect any existing retailer.  There is no evidence any
local or out-of-state discount superstore has even done business
in Turlock.  No existing discount superstore's business is
protected by the Ordinance.  *See Exxon*, 437 U.S. at 127; *Valley
Bank*, 914 F.2d at 1193 (*citing Exxon*, 437 U.S. at 127-128).

Wal-Mart argues *Yamaha Motor Corp. v. Jim's Motorcycle,
Inc.*, 401 F.3d 560 (4th Cir. 2003), shows the City's reliance on
*Exxon* is misplaced.  Doc. 155, Mem. in Opp., 35.  In *Yamaha*, a
Virginia statute allowed any existing franchised motorcycle
dealer to protest the establishment of a new dealership for the
same motorcycle brand anywhere in the Commonwealth.  *Yamaha*, 401
F.3d at 563.  The statute's second paragraph provided in relevant
part:

> No new or additional motorcycle dealer franchise
> shall be established in any county, city or town
> unless the manufacturer [or] distributor . . .
> gives advance notice to any existing franchised
> dealers of the same line-make.  The notice shall
> be in writing and sent . . . at least forty-five
> days prior to the establishment of the new or
> additional franchise.  Any existing franchise
> dealer may file a protest within thirty days of
> the date the notice is received.  The burden of
> proof in establishing inadequate representation of
> such line-make motorcycles shall be on the
> manufacturer [or] distributor[.]

*Yamaha*, 401 F.3d at 563-64.  The second paragraph expanded the
economic protection given to motorcycle dealers by the statute's
first paragraph, which authorized protests of new dealerships
only within an existing dealer's "relevant market area," defined
as a seven- to twenty-mile radius around the existing dealer,
depending on population density.  *Yamaha*, 401 F.3d at 563.

The Commonwealth sought to justify the added protection on
the grounds that,

> in contrast to automobile dealerships, which make
> roughly ninety-five percent of their sales within
> a twenty-mile radius, motorcycle dealerships,
> which are fewer [ ], typically sell within a
> forty-mile radius.  Moreover, the [s]econd
> [p]aragraph was enacted at a time of record
> motorcycle sales nationwide.  Many dealerships
> were complaining to manufacturers that they were
> not sufficiently supplied with the top-selling
> models, and there is some evidence that the
> [s]econd [p]aragraph also aims to avert any
> reduction in production allocation for existing
> motorcycle dealerships.

*Yamaha*, 401 F.3d at 564.

Yamaha sued the Virginia DMV Commissioner and a protesting
dealer in federal court seeking a declaration that the second
paragraph violated the dormant Commerce Clause.  *Yamaha*, 401 F.3d
at 565.  The district court upheld the statute, and the Fourth
Circuit reversed.  The Fourth Circuit ruled the second paragraph
was neutral on its face, and had a legitimate general purpose:
"to protect existing motorcycle dealers in Virginia from unfair
practices by manufacturers (regardless of their location) in the
establishment of new dealerships."  *Yamaha*, 401 F.3d at 568.  The
court then turned to the *Pike* balancing test:

> A statute that does not discriminate against
> interstate commerce may still be struck down under
> *Pike* balancing if "the burden imposed on such
> commerce is clearly excessive in relation to the
> putative local benefits.  If a legitimate local
> purpose is found, then the question becomes one of
> degree."

*Yamaha*, 401 F.3d at 569 (*quoting Pike*, 397 U.S. at 142).

Although, like the Ninth Circuit, the Fourth Circuit
normally defers to legislative determinations of "legitimate
local purpose" and "putative local benefits," *id.* (*citing CTS*

**58**

*Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92-93 (1987)),

"[t]he unnecessary and excessive breadth of the [s]econd

[p]aragraph persuad[ed]" the court "that the statute's burdens

clearly exceed its benefits," *Yamaha*, 401 F.3d at 573:

> As for benefits, the district court could only
> approximate that "some number of existing
> dealers," who are outside the relevant market area
> protected by the First Paragraph but "serve the
> geographic market area of a hypothetical
> prospective dealer in a not insignificant way,"
> might receive some protection on their investment
> and advertising "should the hypothetical dealer
> actually open."  Weighed against this weak benefit
> is a substantial burden, a barrier to market
> entry, that is unparalleled in scope.  The
> Commonwealth has erected this barrier in the
> absence of evidence that protection in the form of
> statewide protest rights for every motorcycle
> dealer was needed.  The Commonwealth's only
> explanation for expanding the protection afforded
> by the First Paragraph is that motorcycle
> dealerships tend to sell within a forty-mile
> radius, which is beyond the First Paragraph's
> "relevant market" protection of a radius up to
> twenty miles.  The Second Paragraph, of course,
> did not limit protest rights to dealers within a
> forty-mile radius of a proposed dealership; it
> imposed no limit at all.  The *Pike* inquiry
> requires us to consider whether the Second
> Paragraph's benefits could have been achieved with
> a less restrictive alternative.  We conclude that
> it could have.  The Second Paragraph could have
> imposed some rational geographic limit on protest
> rights, but it did not.  Under the Second
> Paragraph as it stands, an existing dealer at one
> end of Virginia can protest a proposed dealership
> some 500 miles away at the other end of the state.
> That is overreaching in the extreme.  If we were
> to uphold the blanket statewide protection of the
> Second Paragraph, we would be giving Virginia the
> green light to extend similar protection to
> automobile dealers and franchisees of other
> product lines, thereby turning Virginia into an
> island of economic protectionism.

*Yamaha*, 401 F.3d at 573-74.

Here, the Ordinance's putative benefits are much more

substantial, and its burdens on interstate commerce much less,

than the Virginia statute's.  Unlike the Commonwealth in *Yamaha*, the City has provided evidence that the Ordinance will serve the legitimate goals of maintaining neighborhood shopping areas and proper traffic flows, and minimizing air pollution and urban blight.  See Doc. 165, Pl.'s RSUF ##68-75.  The state court in *Wal-Mart* held:

> [T]he police power empowers cities to control and organize development within their boundaries as a means of serving the general welfare. [The] City legitimately chose to organize the development within its boundaries using neighborhood shopping centers dispersed throughout the city.  The Ordinance is reasonably related to protecting that development choice.

*Wal-Mart*, 138 Cal.App.4th at 303.  A local legislative choice to protect land-use-planning goals and the environment, and to minimize urban blight, is entitled to deference from the courts. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987); *Spoklie*, 411 F.3d at 1059 (*quoting Minnesota v. Clover Leaf Creamery, Inc.*, 449 U.S. 456, 464 (1981)).

Unlike the Commonwealth statute, the Turlock Ordinance erects no barrier to market entry.  The Ordinance does not prevent Wal-Mart, or any other retailer, from doing business and competing in Turlock against the existing stores.  There is no showing that doing business in neighbor retail, discount store, or discount club formats in any way burdens Wal-Mart more than any other retailer, whether local or foreign.  Though Wal-Mart's favored form of retail store, the discount superstore, is prohibited in Turlock, this form is prohibited to all retailers alike, and the dormant Commerce Clause does not protect the particular structure or methods of operation in a retail market.

*See Exxon*, 437 U.S. at 127.  There is no evidence any discount superstore has even been located in Turlock, so none is protected.  Nor is there any evidence of any measurable burden on interstate commerce.  Absent a burden, or even if *arguendo* two retailers cannot use the discount superstore format, no *Pike* balancing weighs against the Ordinance.  There is no need for further evidence for additional *Pike* balancing.  Turlock's Ordinance is valid under the Commerce Clause.

D.   Void for Vagueness

Wal-Mart argues the Ordinance is unconstitutionally vague and ambiguous. Doc. 155, Mem. in Opp., 48-50.

> The fundamental problem with the Ordinance in terms of vagueness is that it allows the City to take whatever position it wants regarding grocery uses.  While the Ordinance was specifically targeted toward Wal-Mart, it vests in the City absolute discretion to allow similar uses for favored retailers.  Thus, although the City has prohibited the planned Supercenter, the Ordinance could be read to allow any other comparably-sized grocery store.

*Id.*

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws that do not infringe upon First Amendment rights have two principal evils: (1) they do not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly; and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit standards for policemen, judges, and juries. *United States v. Jae Gab Kim*, 449 F.3d 933, 941-42 (9th Cir. 2006).  If a statute is not sufficiently clear to provide guidance to

**61**

citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement, the statute is invalid.  Vagueness challenges to statutes that do not involve First Amendment violations must be examined as applied to defendant.  If Wal-Mart's actions clearly fall within the statute, it cannot make a void for vagueness challenge.  *Id.*

The complaint does not assert an as-applied challenge to the Ordinance.  *See* Order, *supra*, 12-16.  Even assuming, *arguendo*, the complaint asserts an as-applied challenge, the challenge must fail because the Ordinance clearly prohibits Wal-Mart from establishing a Wal-Mart Supercenter in Turlock.  *See* Doc. 165, Pl.'s RSUF #105 (there is no uncertainty as to whether the Ordinance prohibits Wal-Mart from operating a Wal-Mart Supercenter in Turlock); *see also* Doc. 204, Suppl. Mem. in Opp., 13.

Finally, the Ordinance is not unconstitutionally vague.  Wal-Mart argues:

> The fundamental problem with the Ordinance in terms of vagueness is that it allows the City to take whatever position it wants regarding grocery uses.  While the Ordinance was specifically targeted toward Wal-Mart, it vests in the City absolute discretion to allow similar uses for favored retailers.  Thus, although the City has prohibited the planned Supercenter, the Ordinance could be read to allow any other comparably-sized grocery store.

Doc. 155, Mem. in Opp., 48-50.

This is a horrible that need not be paraded.  Wal-Mart misreads the Ordinance.  The Ordinance specifically defines "Discount Superstore":

> a store that is similar to a "Discount Store" . . . with the exception that [it] also contain[s] a

62

> full-service grocery department under the same
> roof that shares entrances and exits with the
> discount store area.  Such retail stores exceed
> 100,000 square feet of gross floor area and devote
> at least five percent (5%) of the total sales
> floor area to the sale of non-taxable merchandise.
> . . . .  These stores usually offer a variety of
> customer services, centralized cashing, and a wide
> range of products.  They typically maintain long
> store hours seven (7) days a week.  The stores are
> often the only ones on the site, but they can also
> be found in mutual operation with a related or
> unrelated garden center or service station.
> Discount superstores are also sometimes found as
> separate parcels within a retail complex with
> their own dedicated parking.

Doc. 165, Pl.'s RSUF #32.  *See also* Ordinance No. 1016 (set forth

in Cooke Decl., Ex. B, 6).  The absolute size of a given store is

not the sole determinant; rather, the critical factor for the

Ordinance is the percentage of floor space devoted to the sale of

grocery items ("non-taxable merchandise").  On this point, the

Ordinance is specific and unambiguous: a discount store larger

than 100,000 square feet, *at least five percent of which* (*i.e.*,

5,000 square feet) *is devoted to the sale of groceries*, is

defined as a "Discount Superstore," and may not be established in

Turlock.

> Wal-Mart argues:

> if the City received an application from a favored
> local grocer for a 100,001-square-foot "grocery
> store," the Ordinance would permit the City to
> make whatever classification it wanted.

*Id.*  If by "grocery store" Wal-Mart means a store that sells only

groceries (non-taxable items), the Ordinance does not prohibit a

grocery store larger than 100,000 square feet within Turlock.  A

"Discount Superstore" is a "Discount Store" larger than 100,000

square feet, where at least five percent of the floor space is

devoted to grocery sales.  A "Discount Store" "offers a variety

**63**

of customer services, centralized cashing, and a wide range of
products."  A store that sells only groceries cannot qualify as a
"Discount Store" because it does not sell a "wide range of
products," and cannot for that reason be a "Discount Superstore."
Moreover, Wal-Mart's example applies to a farmers market that
could encompass a much larger area.  The alleged political favor
or disfavor in which an applicant is held does not determine its
success, under the Ordinance.  The Ordinance is not void for
vagueness.

### VI.   CONCLUSION

The Ordinance violates none of Wal-Mart's constitutional or
other rights.  For the foregoing reasons:

(1) The City's motion for summary judgment is GRANTED as to
Wal-Mart's facial challenges to the Ordinance under the Equal
Protection Clause and the Commerce Clause of the United States
Constitution (Wal-Mart's first and third claims for relief), the
Equal Protection Clause of the California Constitution (second
claim for relief), and as to Wal-Mart's void-for-vagueness due
process claim (fourth claim for relief); Wal-Mart has not
asserted as-applied challenges to the Ordinance in the complaint.

(2) The City's motion for summary judgment is GRANTED as to
Wal-Mart's fifth claim for relief, because the City did not
deprive Wal-Mart of any rights, privileges, or immunities secured
by the Constitution or laws of the United States.

(3) The City's motion for summary judgment is GRANTED as to
Wal-Mart's sixth claim for relief, because the Ordinance does not
violate the Equal Protection Clause of the California
Constitution, or the Equal Protection Clause or Commerce Clause,

**64**

of the United States Constitution, and is not unconstitutionally vague.

    (4) The City's motion for summary judgment is GRANTED as to Wal-Mart's seventh claim for relief; no bases for injunctive relief exist because the Ordinance does not infringe Wal-Mart's constitutional or other rights.

    Judgment shall be entered for Defendants, the CITY, against Plaintiff, WAL-MART.  The CITY shall submit a proposed judgment within five (5) days following service of this decision by the clerk.

**SO ORDERED**

**DATED: July _3__, 2006.**

                              **_/s/ OLIVER W. WANGER_____**
                                   **OLIVER W. WANGER**
                              **United States District Judge**

**65**