**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WAL-MART STORES, INC., et al.,**<br>**Plaintiffs,**<br>**v.**<br>**CITY OF TURLOCK, et al.,**<br>**Defendants.** | **1:04-CV-05278 OWW DLB**<br><br>**ORDER RE: DEFENDANTS' MOTION FOR ATTORNEY'S FEES (Doc. 224)** |

## I. INTRODUCTION

Prevailing Defendants, the City of Turlock and the Turlock City Council (collectively, "the City" or "Turlock"), move for an award of attorney's fees under 42 U.S.C. § 1988. Plaintiffs, Wal-Mart Stores, Inc. and Wal-Mart Real Estate Business Trust (collectively, "Wal-Mart"), oppose the motion.

## II. BACKGROUND

The factual background of this case has been discussed at length in several previous decisions. For the purposes of this motion, only a brief summary of facts, most of which where undisputed throughout the litigation, is necessary.

Wal-Mart alleged that its representatives originally began negotiations with the City in December 2002 to establish a Wal-Mart Supercenter in Turlock; that these negotiations appeared likely to succeed as late as July 2003, when Wal-Mart purchased the real property for the prospective Supercenter; and that, at about that time, local grocery store owners learned of Wal-Mart's plans, and began lobbying the Council to exclude Wal-Mart from Turlock in order to protect themselves from Wal-Mart's competition.

On December 16, 2003, and January 13, 2004, the Turlock City Council adopted Ordinance Nos. 1015-CS and 1016 (the "Ordinance"). The Ordinance amended the City's Zoning Code and Northwest Triangle Specific Plan, and was codified in Sections 9-1-202 and 9-3-302 of the Turlock Municipal Code. The Ordinance created three new categories of commercial retail land uses: "Discount Stores," "Discount Clubs," and "Discount Superstores." "Discount Stores" are:

> stores with off-street parking that usually offer a variety of customer services, centralized cashing, and a wide range of products. ["Discount Stores"] usually maintain long store hours seven (7) days a week. The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station. Discount stores are also sometimes found as separate parcels within a retail complex with their own dedicated parking.

A "Discount Club" is:

> a discount store or warehouse where shoppers pay a membership fee in order to take advantage of discounted prices on a wide variety of items such as food, clothing, tires, and appliances; many items are sold in large quantities or bulk.

A "Discount Superstore" is:

> a store that is similar to a "Discount Store" . . . with the exception that [it] also contain[s] a full-service grocery department under the same roof that shares entrances and exits with the discount store area. Such retail stores exceed 100,000 square feet of gross floor area and devote at least five percent (5%) of the total sales floor area to the sale of non-taxable merchandise....These stores usually offer a variety of customer services, centralized cashing, and a wide range of products. They typically maintain long store hours seven (7) days a week. The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station. Discount superstores are also sometimes found as separate parcels within a retail complex with their own dedicated parking.

In Turlock, discount stores and discount clubs are permitted conditional uses in the C-C, C-H, and C-T commercial zones. Discount superstores are not permitted uses, conditional or otherwise, in any City zone. The Ordinance prohibits Plaintiffs from siting a Wal-Mart Supercenter (a "Discount Superstore") in Turlock.

The Ordinance's Preamble makes the following findings:

- WHEREAS, the [City] General Plan (including, but not limited to, policies 2.4-a, 2.4-g, 2.4-h, 2.4-j, 2.4-k) establishes locational requirements for the [regional and neighborhood] retail centers: encouraging a number of neighborhood centers equally dispersed throughout the [C]ity while encouraging a concentration of regional shopping centers along the Highway 99/Countryside Drive corridor; and

- WHEREAS, General Plan policies promote and encourage vital neighborhood commercial districts that are evenly distributed throughout the city so that residents are able to meet their basic daily shopping needs at neighborhood shopping centers; and

***

- WHEREAS, given the changes in the retail sector and the evolution toward ever-bigger stores, it is necessary that the zoning ordinance be amended to regulate larger retail establishments appropriately and to afford them adequate review; and

- WHEREAS, the [City] zoning ordinance (Title 9 of the [City] Municipal Code) has not kept pace with the evolution of the retail sector and fails to adequately distinguish the size, scale and scope of various retail activities;

***

- WHEREAS, the establishment of discount superstores in Turlock is likely to negatively impact the vitality and economic viability of the [C]ity's neighborhood commercial centers by drawing sales away from traditional supermarkets located in these centers; and

- WHEREAS, industry and academic studies indicate discount superstores rarely add any retail services currently not provided within a community, and that the majority of sales growth at a discount supercenter comes from a direct shift of dollars from existing retailers within a community, primarily from grocery stores; and

- WHEREAS, discount superstores compete directly with existing grocery stores that anchor neighborhood-serving commercial centers; and

- WHEREAS, smaller stores within a neighborhood center rely upon the foot traffic generated by the grocery store for their existence and in neighborhood centers where the grocery store closes, vacancy rates typically increase and deterioration takes place in the remaining center; and

- WHEREAS, discount superstores adversely affect the viability of small-scale, pedestrian-friendly neighborhood commercial areas, contributing to the blight in these areas; and

***

- WHEREAS, the [Ordinance's proposed zoning changes] are intended to preserve the [C]ity's existing neighborhood-serving shopping centers that are centrally located within the community ...; and

- WHEREAS, the [C]ity's current distribution of neighborhood shopping centers provides convenient shopping and employment in close proximity to most residential neighborhoods in Turlock, consistent with the Turlock General Plan; and

- WHEREAS, this distribution of shopping and employment creates a land-use pattern that reduces the need for vehicle trips and encourages walking and biking for shopping, services, and employment.

On January 26, 2005, Doucet & Associates, Inc., an engineering firm, filed with the City on Wal-Mart's behalf a

document entitled "an application for entitlements for a Wal-Mart Supercenter proposed for development in Turlock." On April 15, 2005, Wal-Mart filed with the City a revised application. By letter dated May 9, 2005, City Planning Manager Michael I. Cooke rejected the revised application because the operation of a Discount Superstore is barred by the Ordinance.

On February 11, 2004, Wal-Mart filed this lawsuit in federal court alleging that City's expressions of concern for air quality, traffic flows, and urban blight are pretextual, and that the City's true motive is to protect local retailers from competition in violation of the Commerce Clause and Equal Protection Clauses of both the United States and California Constitutions. Wal-Mart also argued the Ordinance is void for vagueness under the United States Constitution's Due Process Clauses.[1]

---

[1] Wal-Mart also filed an action in state court against the City, Case No. F047372. In a decision issued April 5, 2006, the California Court of Appeals for the Fifth Appellate District upheld the Ordinance, rejecting Wal-Mart's challenges that the City unconstitutionally exceeded its police powers and failed to comply with the California Environmental Quality Act:

> (1) a city may exercise its police power to control and organize development within its boundaries as a means of serving the general welfare, (2) [the] City made a legitimate policy choice when it decided to organize development using neighborhood shopping centers dispersed throughout the city, (3) the [O]rdinance was reasonably related to protecting that development choice, and (4) no showing was made that the restrictions significantly affected residents of surrounding communities. Accordingly, the restrictions in the ordinance bear a reasonable relationship to the general welfare and, thus, [the] City constitutionally exercised its police power.

The City did not file any challenges to the pleadings.  In late November 2004, Wal-Mart filed a motion to compel Save Mart Supermarkets, a non-party, to produce certain discovery concerning the Commerce Clause claims.  (Doc. 12.)  Magistrate Judge Dennis L. Beck granted the motion and ordered Save Mart to provide information and documents concerning communications between Save Mart, the City, and other third parties relating to the Ordinance.  (Doc. 30 at 6; Doc. 80 at 5.)  Save Mart moved for reconsideration.  (Doc. 25, filed Feb. 25, 2005.)  The request for reconsideration was denied by the district court on June 1, 2005.  (Doc. 80.)  Among other things, the district court reasoned:

> Save Mart's contention that the Ordinance in no way implicates the Commerce Clause is mistaken. As the magistrate judge noted, state legislation may constitute economic protectionism on the basis of discriminatory purpose or effect. *See Baccus Imps.*, 468 U.S. at 270. **Save Mart has not shown that Wal-Mart's claim that the Ordinance is discriminatory in effect is frivolous or meritless.**

(Doc. 80 at 27 (emphasis added).)[2]

On March 29, 2005, the City moved for summary judgment. (Doc. 50.)  The City supplemented its motion on October 11, 2005.

---

*Wal-Mart v. City of Turlock*, 138 Cal. App. 4th 273, 279 (2006).

[2]    The district court's conclusion that Save Mart had not shown Wal-Mart's claim to be frivolous or meritless applies exclusively to the Commerce Clause claim.  Wal-Mart's suggestion that the district court's decision on the motion for reconsideration applies to the other claims in the case is misplaced.  Although the district court did acknowledge that the requested discovery might be relevant to the other claims in the case and briefly summarized the nature of those claims, the district court did not further discuss the other claims.  (*See* Doc. 80 at 5.)

(Doc. 152.) Wal-Mart filed opposition on November 2, 2005 (Doc. 155) and the city replied on December 12, 2005 (Doc. 190). Oral argument on the motion was heard February 6, 2006 (Doc. 203), at which time the court granted the parties leave to file supplemental briefs concerning the issues of ripeness and exhaustion of administrative remedies in connection with the equal protection claim. (Doc. 204. at 1.) Wal-Mart filed a supplemental brief on February 21, 2006 (Doc. 204), and the City filed a supplement on February 27, 2006 (Doc. 207).[3] On July 3, 2006, the district court granted the City's motion for summary judgment in its entirety. (Doc. 219.)

On August 23, 2006, the City filed the instant motion for attorneys fees (Doc. 224), along with supporting declarations. (Docs. 226, 227 & 231.) Wal-Mart opposed. (Doc. 229, filed on Sept. 29, 2006.) The City replied. (Doc. 230, filed Oct. 6, 2006.)

## III. ANALYSIS

### A. Legal Framework.

42 U.S.C. § 1988(b) provides, in relevant part, that "[i]n any action or proceeding to enforce...[42 U.S.C. §] 1983...the court, in its discretion, may allow the prevailing party...a reasonable attorney's fee as part of the costs." A prevailing

[3] Wal-Mart attaches too much importance to the fact that the district court granted the parties leave to file supplemental briefs. Wal-Mart suggests that this is somehow indicative of the merit of their claims. (Doc. 229 at 6-7.) It is not. It is simply indicative of the district court's attempt to fairly administer justice in an adversarial system.

defendant in a § 1983 action is entitled to an attorneys fee award under § 1988 only if the plaintiff's claims were "frivolous, unreasonable, or without foundation." *Hughes v. Rowe*, 449 U.S. 5, 14 (1980)(citing *Christiansburg Garment Co v. EEOC*, 434 U.S. 412, 421 (1978)).

Because Congress intended to promote vigorous enforcement of civil rights laws, "a district court must exercise caution in awarding fees to a prevailing defendant in order to avoid discouraging legitimate suits that may not be 'airtight.'" *See EEOC v. Bruno's Restaurant*, 13 F.3d 285, 287 (9th Cir. 1993) (quoting *Christiansburg*, 434 U.S. at 422). The Supreme Court warned in *Christiansburg* against the "temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Bruno's Restaurant*, 13 F.3d at 290 (quoting *Christiansburg*, 434 U.S. at 421-22). Accordingly, a prevailing defendant is not entitled to attorney's fees merely because the defendant prevailed on the merits. For example, a Title VII complaint that makes out a prima facie showing of disparate treatment but ultimately fails on the merits should not be deemed "clearly frivolous." *See Warren v. City of Carlsbad*, 58 F.3d 439, 444 (9th Cir. 1995).

Courts should be cautious when considering an award to a prevailing defendant where the lawsuit was initiated by a party with limited financial resources or one who is appearing pro se. *See Miller v. Los Angeles County Bd. of Educ.*, 827 F.2d 617, 619 (9th Cir. 1987). Courts have expressed more willingness, however, to award attorneys fees against "corporate-type

plaintiffs who present meritless civil rights claims," because "[s]aid group of plaintiffs is certainly well equipped to finance a civil rights suit." *Goldrich, Kest & Stern v. City of San Fernando*, 617 F. Supp. 557, 564 -565 (D.C. Cal.1985)

> For the Court, the chilling effects of an award of attorney's fees to prevailing defendants as against a corporate-type plaintiff is de minimus. At the very least, courts should not hesitate to award attorney's fees against corporate civil rights plaintiffs when the *Christiansburg* standard has been met

*Id*.

Turlock cites several cases in support of its request for attorney's fees. First, the City places great emphasis on a First Circuit case, *Raskiewicz v. Town of New Boston*, 754 F.2d 38 (1st Cir. 1985), asserting that *Raskiewicz* presents an "analogous factual pattern." (Doc. 230 at 2.) But, *Raskiewicz* is less analogous than the City suggests. In *Raskiewicz*, the plaintiff, a developer, alleged that the Town of New Boston had deprived him of his civil rights and violated the Sherman Act by refusing to grant him a permit to remove gravel from his property. *Id*. at 43. The district court granted defendants' motions for summary judgment and for attorney's fees. *Id*. The plaintiff appealed both rulings.

The factual circumstances of *Raskiewicz* are complex, but, essentially, the developer alleged that the Town exhibited bias, bad faith, and malice in repeatedly refusing to approve his development plans. The First Circuit began its review of the merits of the case by noting that "federal courts do not sit as a super zoning board or a zoning board of appeals." *Id*. at 44 (citations omitted). The *Raskiewicz* court relied upon a First

Circuit rule that generally "prohibit[s] ordinary land use disputes from being litigated under § 1983." *Id.* at 44. Raskiewicz argued that this rule should be ignored where "bias, bad faith, and other 'opprobrious epithets of malice'" are alleged. But the First Circuit rejected this argument, reasoning that such allegations of bias and bad faith are "commonplace in cases of this nature." *Id.* (citations omitted).

> If all that were required to secure federal jurisdiction were loose claims of conspiracy and corruption, virtually any case of this type could be brought into the federal court. Here, even assuming-which is unclear-that Raskiewicz, in alleging bias and conspiracy, is implicitly alleging actual corruption on the part of the Board and Redimix, and that sufficiently serious, supported, assertions of this type could make out a due process claim under section 1983 (a matter we do not now decide), the record falls far short of creating a genuine issue of material fact with respect to such a claim.

*Id.* The *Raskiewicz* court next examined the factual record and found "nothing that supports an inference of actual bias, let alone corruption," in part because the Town Board "did in fact twice offer Raskiewicz a permit although it was not required by the ordinance to do so." *Id.* at 45.[4] The First Circuit held that Raskiewicz's federal claims were "totally frivolous and unwarranted" and affirmed the award of attorneys' fees and costs to the defendants.

*Raskiewicz* does not provide helpful guidance here. First, the case analyzes and applies various lines of First Circuit authority that appear to have no direct parallels in the Ninth Circuit. Second, the fact that the *Raskiewicz* court was

---

[4] The *Raskiewicz* court reached a similar conclusion with respect to plaintiff's Sherman Act claims. 754 F.2d at 45.

unimpressed by the plaintiff's allegations of bias only underscores the fact-specific nature of the *Christiansburg* inquiry.

More helpful is *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055 (9th Cir. 2006). In that case, the municipal defendant refused to allow plaintiff permission to land his private jet at the local airport because the jet violated the airport's pre-existing weight restrictions. *Id.* at 1058. Plaintiff filed suit, alleging both constitutional and statutory grounds for relief. *Id.* at 1059. The district court deemed all of Plaintiff's constitutional claims to be frivolous. The district court then granted defendants' motion for fees in part as to the fees incurred defending against the frivolous claims, but denied the motion as to fees incurred defending against several non-frivolous statutory claims. *Id.*. The Ninth Circuit affirmed, reasoning that Tutor's constitutional claims were indeed frivolous:

> Although Tutor cites various cases which he contends demonstrate that his claims were not frivolous, as we explain below, we conclude that the district court did not abuse its discretion when it found that Tutor lacked a factual and legal basis for his constitutional claims at the outset of the litigation.

*Id.* at 1061. For each constitutional claim, the Ninth Circuit inquired whether the plaintiff had a "factual and legal basis for his constitutional claim[] at the outset of the litigation." For example, with respect to plaintiff's procedural due process claim, the Ninth Circuit reasoned:

> To establish a violation of procedural due process a plaintiff must demonstrate: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

> protections. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).
>
> As noted above, Tutor was not deprived of a liberty or property interest because he was able to access his vacation home by use of another aircraft. Accordingly, the district court did not abuse its discretion when it found that Tutor knew that this claim was frivolous from the outset of the litigation.

*Id.* at 1061 (emphasis added). The Ninth Circuit's reasoning with respect to the plaintiff's equal protection claim was similar:

> It is clear that aircraft weight is not a suspect classification, and there is no fundamental right to land an aircraft at any particular airport. *See Hager v. City of West Peoria*, 84 F.3d 865, 872 (7th Cir. 1996) ("Access to real property does not rise to the level of a fundamental right such that its denial merits heightened scrutiny."). Therefore, rational basis review applies.
>
> Under rational basis review, the Equal Protection Clause is satisfied if: (1) "there is a plausible policy reason for the classification," (2) "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker," and (3) "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger*, 505 U.S. at 11 (citations omitted).
>
> Tutor's arguments do not overcome the obvious rational basis for the weight limitation. Since the weight restriction is closely related to the defendants' interest in preserving the condition of the runway, and Tutor had no factual basis to support his contention that the defendants permitted other aircraft exceeding the 95,000 pound maximum take-off weight to operate at the airport, the district court did not abuse its discretion when it concluded that Tutor knew or should have known that this claim was frivolous.

*Id.* at 1061-62 (emphasis added)(parallel citations omitted). The same result was reached regarding Tutor's Commerce Clause claim

> Tutor argued that defendants' ban on dual-wheel aircraft with a maximum take-off weight in excess of 95,000 pounds is an impermissible burden on interstate commerce. To prove a Commerce Clause violation, Tutor had the burden of showing that defendants' restriction has the effect of discriminating against out-of-state

> interests as compared to instate interests, or was imposed with the primary purpose of regulating interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). Tutor, however, merely asserted that he believed the ban was an impermissible burden on interstate commerce without offering any evidence to support the claim. Tutor offered no evidence indicating that the ban had anything more than an incidental effect on interstate commerce or that the weight restriction was imposed for an impermissible purpose, rather than the obvious purpose of promoting the safety of the airport by preventing deterioration of its runways. Accordingly, the district court did not abuse its discretion when it found that Tutor knew or should have known that this claim was frivolous from the outset of the litigation.

*Id.* at 1061-62 (emphasis added)(parallel citations omitted).

Wal-Mart argues that *Tutor-Saliba* is distinguishable because here "the allegations underlying Wal-Mart's constitutional challenges had extensive factual support" and "the legal theories underlying this action enjoyed extensive support in the case law." (Doc. 229 at 20.) Whether Wal-Mart is correct in this assertion is discussed in detail below. In general, however, Wal-Mart does not take issue with the general approach taken in *Tutor-Saliba* – that fees are warranted where the plaintiff "knew or should have known that [a] claim was frivolous from the outset of the litigation."

The City next cites *Goldrich, Kest & Stern v. City of San Fernando*, 617 F. Supp. 557 (D.C. Cal. 1985), which concerned a developer who alleged that the City of San Fernando violated his constitutional rights by failing to rezone property so as to allow the developer to subdivide his land. The developer sued the City of San Fernando, alleging that the City's conduct (1) constituted a taking; (2) exceeded the City's police powers; and (3) violated plaintiff's equal protection rights. Ultimately,

the *Goldrich* court awarded attorney's fees to the defendant because

> the defects of Developer's suit were of such magnitude that the plaintiff's ultimate failure was clearly apparent at some significant point in the proceedings.

*Id.* at 565 (internal quotations and citations omitted).

The plaintiff in *Goldrich* had filed a parallel lawsuit in state court, raising state procedural challenges to the City's actions. The state court ruled in favor of the defendants while the federal case was still in its early stages. The *Goldrich* court found this to be significant in its determination that a fee award was justified.

> The State Decision, based on identical facts and discovery, acts as a "significant point in the proceedings." By this date, Developer must have realized the ill-founded nature of its federal claims. Evidence produced at trial proved unconvincing to a Superior Court judge, yet Developer continued on, seeking to proffer the same proof to this Court.
>
> On January 29, 1985 this Court dismissed Developer's second amended complaint; this action coincides with the State Decision of January 14, 1984. At the hearing the Court alerted plaintiff of the perilous course that [its suit] may be taking due to an increasingly apparent lack of support for its claims. This Court's oversight now provides a point of reference for awarding fees. In sum, by January, 1984 it should have been patently obvious to Developer that this action was meritless, grounded on baseless, unsubstantiated allegations. This Court finds that the continued prosecution of the federal claims by Developer was frivolous, unreasonable and without foundation.

*Id.* at 565 (internal quotations and citations omitted).

Wal-Mart asserts that *Goldrich* is not helpful to the City because, at the outset of the *Goldrich* litigation, the district court granted two motions to dismiss for failure to state a claim and repeatedly warned the developer that his case had no merit. (Doc. 229 at 21.) Nothing in the record indicates that the

district court issued similar warnings to Wal-Mart in this case. There is, in fact, evidence to the contrary with respect to Wal-Mart's Commerce Clause claim. The decision denying Save Mart's motion for reconsideration states that "Save Mart has not shown that Wal-Mart's claim that the Ordinance is discriminatory in effect is frivolous or meritless." (Doc. 80 at 27.) This at least suggests that Wal-Mart's Commerce Clause claim was not meritless from the outset.

As discussed, the *Goldrich* court also emphasized that the developer "had previously lost a state court action involving identical claims." (*Id.*) Wal-Mart also brought a parallel state court action against the City, *Wal-Mart Stores, Inc. v. City of Turlock*, 138 Cal. App. 4th 273, 299 (2006). Although no federal constitutional challenges were raised in that action, the state court decision did address the question of whether, under the California Constitution, the Ordinance exceeded the police power of the city. (*Id.* at 299.) In analyzing that claim, the state court found that the Ordinance was rationally related to a legitimate public purpose, noting "that the administrative record is replete with evidence of the city's concerns with traffic and urban/suburban decay that might arise from the development of discount superstores." *Id.* (internal citations and quotations omitted). The state court's reasoning is relevant:

> Wal-Mart does not argue that its Supercenters do not have significant environmental effects, or even that they do not produce the results City fears-to wit, urban/suburban decay, increased traffic, and reduced air quality. Instead, Wal-Mart argues the lack of a rational relationship between those concerns and the Ordinance is demonstrated by the fact that, while the Ordinance bans superstores entirely, it permits the development of alternative multitenant shopping centers

> which, according to the evidence, have even greater negative environmental effects. The alternative developments to which Wal-Mart refers are those discussed in the TJKM report of November 20, 2003, all of which include a grocery supermarket of 60,000 square feet or more. It is clear from the record, however, that City decision makers did not ignore either the TJKM report, the statistics it presented, or the idea Wal-Mart sought to convey before enacting the Ordinance. Rather, they appear to have agreed with City's planning staff that "[w]hile any large-scale retail store can draw customers with low prices and a wide selection of goods, the big box grocers present a unique threat because of the inclusion of discount retail and full-service grocery under a single roof."
>
> Further, it must be noted that City does have planning control, through the CUP process, over the prospective development of discount stores, discount clubs, and supermarkets of 60,000 square feet or more. And City has placed on record its view that the development of large grocery supermarkets in regional shopping centers raises environmental concerns and is undesirable. Wal-Mart cites no authority to support the proposition that a municipality must address all similar concerns related to the general welfare by the same means or in the same way.

*Id.* at 301-302. In addition, the state court rejected Wal-Mart's argument that "the Ordinance was enacted for the purpose of targeting Wal-Mart." *Id.* at 302.

> The Ordinance does not single out Wal-Mart but, instead, prohibits all discount superstores within City's boundaries. The record demonstrates, to be sure, that Wal-Mart's prospective competitors, and some of its detractors, did lobby City officials regarding enactment of the Ordinance. As City points out, however, it is well-established that courts must "eschew inquiry into what motivated or influenced those who voted on...legislation." *(Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616, 1623, 38 Cal.Rptr.2d 876.) "[T]he validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or the influences upon, the legislators who enacted the measure." ( *City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 913, 120 Cal.Rptr. 707, 534 P.2d 403; *see also Ensign Bickford Realty Corp. v. City Council, supra*, 68 Cal.App.3d at p. 478, 137 Cal.Rptr. 304.)
>
> Further, the simple fact that Wal-Mart was the first company to feel the effect of the Ordinance is not

> sufficient to establish that Wal-Mart was targeted in any unconstitutional manner. If that fact were enough to require a finding that a local governmental entity had exceeded its police power, then local government could never react to new situations brought to its attention by a specific proposal without having that reaction invalidated under the claim that it "targeted" the specific proposal. In short, local governments need the flexibility to react to specific proposals for a new kind of development not previously contemplated where such a development will or may have harmful consequences to the locality's legitimate planning objectives.

*Id.* at 302. Unlike in *Goldrich*, where the state court decision was issued early during the federal litigation, the state court decision in *Wal-Mart* was issued on April 5, 2006, after oral argument was heard on the motion for summary judgment in the federal case. *Goldrich* does not present a parallel factual circumstance.

In sum, the *Christiansburg* inquiry is highly fact-specific, and *Tutor-Saliba* provides some general guidance, standing for the proposition that fees are warranted where the plaintiff "knew or should have known that [a] claim was frivolous from the outset of the litigation."

**B. Application to the Claims in this Case.**

**1. Wal-Mart's Purported As-Applied Claim.**

Initially, it was not clear whether Wal-Mart sought to bring only a facial challenge to the ordinance, or whether the lawsuit also included an as-applied challenge. After the City moved for summary judgment on only the facial challenge, Wal-Mart continued to insist that the complaint also raised an as-applied challenge. But, Wal-Mart's purported as-applied claim could not withstand scrutiny. While the operative complaint was filed on February 11, 2004 (Doc. 1), the City did not deny Wal-Mart's application

until May 9, 2005 (Doc. 191). Accordingly, the district court ruled:

> The February 11, 2004, complaint could not have, and did not, allege the City violated Wal-Mart's constitutional rights in applying the Ordinance to deny Wal-Mart's Supercenter permit application, because the City did not apply the Ordinance to Wal-Mart's Supercenter supplemented application until May 9, 2005. The complaint does not allege facts regarding the specific application of the Ordinance to Wal-Mart's Supercenter permit application.
>
> ***
>
> The complaint solely presents a facial challenge to the Ordinance.

(Summary Judgment ("SJ") Decision at 14.)

Alternatively, even if the complaint had asserted an as-applied challenge, the district court analyzed whether any such claim could be maintained. This analysis was suggested by Defendants' own memorandum in support of its motion for summary judgment, which preemptively attacked Wal-Mart's ability to maintain an as-applied claim, arguing that any such claim would not be ripe for review, that the futility exception would not apply, and that the statute of limitations operated as a bar. (Doc. 51 at 21-24.) The applicability of the futility exception and the statute of limitations issue were resolved <u>in Wal-Mart's favor</u>. The district court ruled that the facial challenge would have subsumed any as-applied claim because the Ordinance left the City no discretion to approve any Supercenter.

> *Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064 (9th Cir. 2003), holds no as-applied challenge can be asserted where a statute grants no discretion to the administering agency:

> As the district court recognized, this is essentially a facial challenge to the inherently unequal criteria for moving the IPES Line contained in the 1987 Plan. The 1987 Plan enshrined the differential triggering requirements for the vacant lot equations of California and Nevada; the Agency had no discretion to deviate from the Plan's provisions. In 1999, the Agency did not apply equal terms unequally - it applied inherently *unequal* terms in equal fashion. If the Association thought the inequality unlawful, its quarrel was with the terms of the 1987 Plan itself.
>
> *Tahoe Sierra*, 322 F.3d at 1080 n.15; *see also Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 689 (9th Cir. 1993).

(SJ Decision at 27-28.)

Wal-Mart suggests that the as-applied claim should not be considered frivolous because the district court devoted almost 16-pages to its discussion of the as-applied claim and related issues. (*See* SJ Decision at 16-28.) Wal-Mart cites *Hughes v. Rowe*, 449 U.S. 5, 15-16 (1980), which held that "[e]ven [] allegations that were properly dismissed for failure to state a claim" were not meritless in the *Christiansburg* sense" where they "deserved and received the careful consideration of both the District Court and the Court of Appeals."

> Allegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, "groundless" or "without foundation" as required by Christiansburg.

*Hughes*, 449 U.S. at 15-16. This argument is persuasive. Although the district court ultimately found that no as-applied claim had been asserted, whether any such claim could be maintained was a debatable question that the district court discussed at length. *Hughes* suggests that a fee award is not appropriate under such circumstances.

**2. Constitutional Challenges.**

Wal-Mart alleged that the Ordinance is unconstitutional on three grounds: (1) it deprives Wal-Mart of the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution; (2) it discriminates against interstate commerce, in violation of Article I, Section 8, Clause 3, of the United States Constitution (the "Commerce Clause"); and (3) it is unconstitutionally vague.

**a. Equal Protection Challenges.**

**(1) Federal Equal Protection Challenges.**

With respect to Wal-Mart's federal equal protection challenge, the district court first concluded that "[b]ecause the Ordinance involves social and economic policy, and neither targets a suspect class nor impinges on a fundamental right, it is reviewed according to the 'rational basis' standard." (SJ Decision at 29 (internal citations omitted).)

> Under this test, statutes are generally presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Fields v. Legacy Health System*, 413 F.3d 943, 955 (9th Cir. 2005). A legislative classification under rational basis review must be wholly irrational to violate equal protection. *Id.* The challenger bears the burden of negating every conceivable basis which might support the legislative classification, whether or not the basis has a foundation in the record. *Id.* A legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. *Beach Communications*, 508 U.S. at 315.

(*Id.*)

The City advanced a number of bases for the Ordinance, both in the Ordinance's preamble and in subsequent declarations from

City planners. Critically for the purposes of this motion, a number of independent studies were cited in the Ordinance's legislative record, including:

- A study commissioned by the City of Oakland that shows the traffic impact of a discount superstore is greater than the traffic impact of a supermarket, a discount club, or a discount store. It also shows discount superstores cause blight and an increase in air pollution.

- A study by VRPA Technologies, Inc., that shows Wal-Mart Supercenters generate 34.5% more vehicle trips than had been previously estimated by the Institute of Transportation Engineers.

- A report for the City of Fremont that shows discount superstores generate more vehicle trips than discount clubs.

- A study by Strategic Economics that discusses the store closures and negative effects on the City of Fremont's business district the study stated would be caused by a discount superstore opening in the City of Fremont.

- A Contra Costa County study that shows discount superstores are likely to cause blight and increased traffic.

- A Mississippi State University study that discusses the economic impacts of discount superstores on existing businesses.

- An Oklahoma City report that describes the relationship between urban blight and Wal-Mart Supercenters.

- A Business Week article that discusses store closures caused by Wal-Mart Supercenters.

Wal-Mart should have known about these various bases for banning Supercenters advanced in these sources at the outset of this litigation.

The district court deemed all of the interests protected by the Ordinance to be legitimate state interests, over Wal-Mart's unfounded objections. For example, Wal-Mart's argued that the

prevention of urban blight is not a legitimate state interest (Doc. 155 at 18),[5] despite a body of binding contrary authority. *See Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 (9th Cir. 1993) (Commerce Clause); *Burlington Northern R.R. Co. v. Department of Public Serv. Regulation*, 763 F.2d 1106, 1109 (9th Cir. 1985) ("[t]he standard for judging the constitutionality of a statute...which regulates economic activity, is the same under the...[E]qual [P]rotection or [C]ommerce [C]lauses").

Wal-Mart also questioned the distinctions drawn in the Ordinance between discount superstores, which are prohibited, and other retail formats. Wal-Mart argued that this distinction bears no rational relationship to any legitimate interest. (Doc. 155 at 19-27.) The City, in its memoranda in support of its motion for summary judgment, pointed out that the legislative history was filled with evidence that a discount superstore has uniquely detrimental impacts on a community.

---

[5] Specifically, Wal-Mart argued:

> The City's explanation for the cause of blight or decay is erroneous. The City has it backwards. "Blight" is not caused by new development; rather, blight results from economic and community deficiencies which have resulted in a decline in employment, income, and wealth. The resulting loss of consumer demand can result in failures of neighborhood businesses, which may result in under-maintained or vacant buildings if appropriate re-tenanting does not occur. In short, losses of community vitality, and not any commercial "use," cause blight.

(Doc. 155, 19.)

> [S]tudies in the legislative record showed [] Discount Superstores cause more traffic than Discount Stores, Discount Clubs, or supermarkets, and this provides a rational basis for prohibiting them. There was evidence in the record that people shop for groceries 2-3 times a week - more often than they visit a Discount Store or a Discount Club. [citation] Although Discount Clubs sell groceries, because they sell in bulk, the number of customer trips is less. [citation] Although Supermarkets are similar to Discount Superstores in that they generate more trips per week than Discount Stores and Discount Clubs, they do not attract customers from as large a trade area as Discount Superstores, which because of their size and the synergy between their supermarket and discount store components draw customers from a larger area and therefore cause more vehicle miles to be driven. [citation] This increased traffic also causes more air pollution. [citation]
>
> The record also included evidence that competition from a Discount Superstore would threaten the viability of existing neighborhood centers by causing the closure of the supermarkets that anchor those centers, thereby causing blight. This also provides a rational basis for prohibiting Discount Superstores. [citations] With regard to Turlock specifically, the City Council received information that one Discount Superstore opening in Turlock would likely cause two or three supermarkets to close. [citation] This would mean two or three neighborhood shopping centers would lose their anchors and those shopping centers would then likely slip into decay.

(Doc. 51 at 26-27.) Wal-Mart knew or should have been aware of the bases that would be advanced by the City prior to filing its lawsuit because the bases were articulated in the Preamble to the ordinance. Wal-Mart submitted evidence suggesting that the evidence upon which the City relied was erroneous, but such evidence is of no legal consequence:

> It is well established a legislative choice is not subject to courtroom fact-finding on rational-basis review, and may be based on rational speculation unsupported by evidence or empirical data. Judicial review is at an end once the court identifies a plausible basis on which the legislature may have relied. *Rui One Corp.*, 371 F.3d at 1155; *accord*, *SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662, 680 (9th Cir. 2002); *Jackson Water Works*,

> *Inc. v. Public Utilities Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986) ("[a]ll that is needed to uphold the state's classification scheme is to find that there are 'plausible,' 'arguable,' or 'conceivable' reasons which may have been the basis for the distinction"); *Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority*, 825 F.2d 367, 370 (11th Cir. 1987) ("the federal courts do not sit as arbiters of the wisdom or utility" of economic legislation) (*citing Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469 (1981)).

(SJ Decision at 33-34.)

Wal-Mart placed greatest emphasis on its final allegation: that the ordinance violated equal protection because it was the result of collusion between local economic interests (owners of the neighborhood grocery stores and union representatives of those who worked in them) and the Council, acting with the improper legislative motive of protecting local merchants and unions from Wal-Mart's "foreign" competition. (Doc. 155 at 17.) The district court found that, even if true, such improper motives did not require the invalidation of the Ordinance under an equal protection analysis:

> Even an improper motive, without more, does not affect constitutional review of legislation:
>
>> According to the Supreme Court, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications*, 508 U.S. at 315. The First Circuit has specifically rejected a claim that an environmental ordinance violated the Equal Protection Clause because its challengers alleged that its passage was motivated by a desire to restrict a business's power in dealing with unions.
>
> *Rui One Corp.*, 371 F.3d at 1155 (*citing Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 485 (1st Cir. 1991)).
>
> In *International Paper*, a paper company sued to invalidate and enjoin enforcement of a municipal ordinance regulating emission of pollutants by industries and businesses, including plaintiff. *Int'l Paper*, 928 F.2d at 481-82. The company argued the ordinance unduly restricted its bargaining power in a

> labor dispute with striking unions. *Int'l Paper*, 928 F.2d at 482. The town's board of selectmen, most of whom were striking union employees, authorized the drafting of the ordinance, and proposed it be put to a public referendum, and it passed. *Id.* After ruling the ordinance was a facially valid exercise of the town's power to enact economic legislation, the court refused to "delve into the motivations of the Board members who proposed and drafted the [o]rdinance":
>
> > [W]hile courts may look to legislators' motives where a suspect or quasi-suspect classification is subjected to discrimination or a fundamental right is infringed [citations], absent these circumstances, we will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.
>
> *Int'l Paper*, 928 F.2d at 485.

(SJ Decision at 37-38.)

Although the district court rejected all of Wal-Mart's arguments, the critical question is whether the equal protection claim had a legal or factual basis at the outset of the litigation. Wal-Mart cites a number of cases in support of its assertion that "the equal protection claim was well-grounded in fact and constitutional jurisprudence, including *Romer v. Evans*, 517 U.S. 620, 634 (1996). In *Romer*, the Supreme Court applied a version of the rational basis test to conclude that a Colorado Constitutional amendment that prohibited all legislative, executive, or judicial action designed to protect homosexual persons from discrimination "lacks a rational relationship to legitimate state interests," id. at 632, in part because a "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 634. Wal-Mart maintained that, under *Romer,* where a statute singles out a group of persons because of a particular trait, an otherwise legitimate state interest may be overcome if there is evidence of animus

toward that corporation.  Applying this principle to their own situation, Wal-Mart argued that, where there was evidence that the City singled out Wal-Mart because of its use of a particular retail format, the Supercenter, the City's stated interests could be overcome.

Although the district court did not adopt this application of the rational basis test, it cannot be said that the theory underlying its claim was totally without merit.  Prior to the filing of this lawsuit on February 11, 2004, Wal-Mart's theory had not been addressed, directly or indirectly, by any court of appeals or the Supreme Court.  Moreover, whether the "higher-order rational basis review,"[6] utilized by the Supreme Court in *Romer*, 517 U.S. 620 (applied to homosexuals), and *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)(applied to mentally retarded), is broadly applicable in other contexts is far from clear.  *See Powers v. Harris*, 379 F.3d 1208, 1224 (10th Cir. 2004)(discussing three competing interpretations of the *Cleburne/Romer* approach).

By July 2006, at least one other district court from another circuit had rejected a very similar argument in a case brought on Wal-Mart's behalf.  *See Retail Industry Leaders Ass'n v. Fielder*, 435 F. Supp. 2d 481, 501 (D. Md. 2006).  In *Retail Industry Leaders*, an association (of which Wal-Mart was a member) challenged a Maryland statute imposing a tax upon large, for-

---

[6]    The Cleburne/Romer approach is sometimes referred to as "rational basis with bite."  *See* Gayle Lynn Pettinga, *Note, Rational Basis with Bite: Intermediate Scrutiny by Any Other Name*, 62 Ind. L.J. 779 (1987).

profit employers that spend less than certain percentage of total wages paid to employees in the state on health insurance costs. It was anticipated that only Wal-Mart would be affected by the statute. The association argued that the statute violated the Equal Protection Clause because it intentionally targeted Wal-Mart. But, the district court rejected this argument, explaining that "antipathy" was only relevant in the equal protection context in cases involving "politically vulnerable groups":

> Unless there is a reason to "infer antipathy" from the targeting of a particular group or person, "[t]he Constitution presumes that...even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Beach Commc'ns*, 508 U.S. at 314, (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). It is only in cases involving politically vulnerable groups that the Supreme Court has appeared to rely, at least in part, on legislative antipathy when invalidating a law under the rational basis test. *See Romer v. Evans*, 517 U.S. 620 (1996) (invalidating Colorado constitutional amendment that prohibited the state and local governments from passing laws to protect persons from discrimination based on their sexual orientation); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) (invalidating zoning ordinance that authorized a denial of a special use permit for mentally retarded persons to live together in a group home). Wal-Mart does not contend that it is similarly situated to the plaintiffs in *Romer* and *Cleburne*, and the fact that it is the only entity subject to the spending requirement of the Fair Share Act is not itself sufficient to make out a viable equal protection claim. *See City of New Orleans v. Dukes*, 427 U.S. 297, 306 (1976) (expressly overruling *Morey v. Doud*, 354 U.S. 457 (1957)).

*Id.* at 501. This analysis is persuasive. However, this case was decided after the filing of this lawsuit. Moreover, it is non-binding authority.

In sum, although the district court ultimately rejected Wal-Mart's equal protection argument, Wal-Mart's animus argument was

not totally without foundation at the outset of the litigation.

**b. California Equal Protection Claim**

Wal-Mart also invoked the Equal Protection Clause of Article I, Section 7, of the California Constitution, which is essentially interpreted as being equivalent to the federal equal protection clause. *See Manduley v. Superior Court*, 27 Cal. 4th 537, 572 (2002); *Kasler v. Lockyer*, 23 Cal.4th 472, 481-82 (2000). The district court rejected the California Constitutional equal protection claim for the same reasons it rejected the federal equal protection claim, noting that all are "equally enjoined from establishing a discount superstore in Turlock." (SJ Decision at 40.) Yet, for the same reasons that the federal equal protection claim was not frivolous, neither was the California equal protection claim.

**c. Commerce Clause Claim.**

Wal-Mart next contended that the Ordinance violated the dormant Commerce Clause, which prohibits the states from enacting laws which impede the flow of interstate commerce. *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982). In fact, as discussed above, discovery related to the Commerce Clause claim was the subject of a motion to compel. The district court, ruling on a non-party's motion for reconsideration of the magistrate's ruling granting Wal-Mart's motion to compel, reasoned that the non-party had failed to establish that Wal-Mart's Commerce Clause claim was meritless or frivolous. (Doc. 80 at 27.) Wal-Mart was entitled to rely on this determination in pursuing its Commerce Clause claim.

Moreover, although the district court eventually ruled in

favor of defendants on the Commerce Clause issues, Wal-Mart's claim was not totally unreasonable from the outset of the litigation.  Wal-Mart advanced a number of legal arguments that were not wholly baseless.  For example, in support of its argument that a statute may violate the Commerce Clause if it is the intent of the legislature to discriminate against interstate commerce, Wal-Mart cited *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263 (1984), in which the Supreme Court stated:

> A finding that state legislation constitutes "economic protectionism" may be made on the basis of either discriminatory purpose or discriminatory effect[.]

*Id.* at 270 (citations omitted).  The district court did not find this language controlling, however, reasoning that "the *Bacchus Imports* Court did not hold the statute was unconstitutional solely because of its intended purpose."  (SJ Decision at 46.)

> *Bacchus Imports* cited *Hunt* for the proposition that a state statute may be invalidated based on its apparent purpose.  *Bacchus Imports*, 468 U.S. at 270.  However, *Hunt* does not stand for the proposition that alleged discriminatory purpose alone will invalidate a statute.  *See Hunt*, 432 U.S. 333, 351 (1977) ("[a]s the [d]istrict [c]ourt correctly found, the challenged statute has the *practical effect* of not only burdening interstate sales of Washington apples, but also discriminating against them") (emphasis added).

(*Id.* at 46-47.)  The district court distinguished the cases cited by Wal-Mart and ultimately rejected Wal-Mart's argument.  But to now find the argument to be frivolous would be to succumb to the "temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation."  *Bruno's Restaurant*, 13 F.3d at 290 (quoting *Christiansburg*, 434 U.S. at 421-22.)  Wal-Mart advanced other legal theories in support of

its Commerce Clause claims that, although ultimately unsuccessful, cannot be deemed frivolous in hindsight, particularly in light of the fact that the district court previously indicted that Wal-Mart's Commerce Clause claims were not frivolous. Defendants are not entitled to recover attorney's fees incurred defending against this claim.

**d. Vagueness**

Finally, Wal-Mart argued that the Ordinance is unconstitutionally vague and ambiguous. (Doc. 155, at 48-50.) This claim was rejected outright because "[v]agueness challenges to statutes that do not involve First Amendment violations must be examined as applied to defendant." *United States v. Jae Gab Kim*, 449 F.3d 933, 941-42 (9th Cir. 2006)(citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)). Because Wal-Mart had not asserted an as-applied challenge to the Ordinance, the vagueness claim was meritless. In the alternative, assuming, *arguendo*, that the complaint had asserted an as-applied challenge, the district court found that the vagueness challenge necessarily failed because the Ordinance clearly prohibits Wal-Mart from establishing a Wal-Mart Supercenter in Turlock. (SJ Decision at 62.)

Wal-Mart suggests that it had a non-frivolous basis for arguing that the Ordinance was unconstitutionally vague as to what uses are <u>permitted</u>. For example, Wal-Mart suggested that if it "sought to build two stores next door to one another -- a discount store and a grocery store -- where each store was less than 100,000 square feet, the Ordinance would not provide a clear ascertainable standard for Wal-Mart (or any other applicant) to

determine whether such a project would be permitted." (Doc. 229 at 18.) However, Wal-Mart never pled or presented any evidence that it filed any application, complete or otherwise, with Turlock regarding anything other than a Supercenter. Therefore, there could never have been any as-applied vagueness claim based on the Ordinance's failure to clearly delineate whether Wal-Mart's hypothetical two-store plan would be permissible.

The vagueness claim was frivolous from the outset of the litigation. Defendants are entitled to reasonable attorney's fees incurred defending against the vagueness claim.

**C. Reasonable Attorney's Fees.**

"In determining what a reasonable attorney's fee entails, the district court must apply the hybrid approach adopted in *Hensley v. Eckerhart*, 461 U.S. 424, 433 [] (1983)." *United States v. $12,248 U.S. Currency*, 957 F.2d 1513, 1520 (9th Cir. 1992). "The most useful starting point for determining the amount of a reasonable fee is [1] the number of hours reasonably expended on the litigation [2] multiplied by a reasonable hourly rate." *Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001)(relying upon *Hensley*, 461 U.S. at 433). The resulting figure is known as the "Lodestar."

To determine what qualifies as reasonable attorney's fees, the Ninth Circuit has adopted the twelve Lodestar Factors as "guidelines [and] as appropriate factors to be considered in the balancing process required in a determination of reasonable attorney's fees:"

(1) the time and labor required,

(2) the novelty and difficulty of the questions involved,

(3) the skill requisite to perform the legal service properly,

(4) the preclusion of other employment by the attorney due to acceptance of the case,

(5) the customary fee,

(6) whether the fee is fixed or contingent,

(7) time limitations imposed by the client or the circumstances,

(8) the amount involved and the results obtained,

(9) the experience, reputation, and ability of the attorneys,

(10) the "undesirability" of the case,

(11) the nature and length of the professional relationship with the client, and

(12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 71 (9th Cir. 1975).

**1. Wal-Mart's Objections**

Wal-Mart only raises two objections to the amount of fees requested. First, Wal-mart argued that the City has failed to provide evidentiary support for its request for $25,000 in fees for bringing the instant motion. In response to this objection, the City filed further billing documentation along with its reply brief. (*See* Doc. 231, Jarvis Decl., Ex. B.) These supplemental billing records sufficiently document the City's fees on fees request.

Second, Wal-Mart notes that the City's attorneys placed a

cap on the amount of fees the City would need to pay in this case. Wal-Mart objects to any fee award that exceeds the cap. Specifically, Wal-Mart argues:

> Wal-Mart has learned...that the City will not have to pay $25,000 for bringing this motion. The City and its attorneys have a deal by which the City need only pay "an agreed not-to-exceed figure, with the understanding that, if the motion is successful, [City's] attorneys may recover any amounts billed in excess of this not-to-exceed figure as part of the ultimate award of fees."... In other words, if the City wins the motion, Wal-mart pays $25,000, but if the City loses, it pays its attorneys a lesser sum. Wal-Mart should not have to pay more than the City itself would have to pay if the motion were denied. This, Wal-Mart's liability, if any, for fees incurred by the City in connection with the motion should be capped to the currently undisclosed ceiling figure and the City should disclosed [sic] the cap in its reply.

(Doc. 229 at 24.) Notably, Wal-Mart cites no legal authority to support this argument. In fact, the bulk of legal authority suggests exactly the opposite. It is well-settled that prevailing parties may be awarded fees under § 1988 even if they were represented free of charge by a nonprofit legal aid organization. *Blum v. Stenson*, 465 U.S. 886, 894-95 (1984). This is because § 1988 makes the "party, rather than the lawyer," eligible for a discretionary award of attorney's fees. *Venegas v. Mitchell*, 495 U.S. 82, 87-88 (1990)(emphasis added).

//
//
//
//
//
//
//

**2. The City's Request.**

The City has endeavored to separate its request for fee reimbursement according to each claim as follows:

| | |
|---|---|
| **Equal Protection Claim:** | $71,456.90 |
| **Commerce Clause Claim:** | $108,844.07 |
| **As Applied Claim:** | $12,255.00 |
| **Vagueness Claim:** | $4,181.29 |
| **Fees-on-Fees:** | $20,937.50 |
| **Total Request:** | $217,674.76 |

As discussed above, the City is entitled to reimbursement for expenses incurred defending against the vagueness claim only, in the amount of $4,181.29.

Turlock also requests reimbursement for fees incurred preparing its fee petition. Turlock's total fees-on-fees request is $20,937.50. Because Turlock is entitled to fees for only the vagueness claim,[7] a minor issue in this very complex case, Turlock should only receive a small portion of its fees-on-fees request. Having reviewed all of the briefs and supporting documents submitted by Turlock in support of its fee petition, it is reasonable to award Turlock twenty percent (20%), one-fifth of its fees-on-fees request, a percentage that roughly reflects (a) the amount of time dedicated to argument on the frivolity of the vagueness claim and (b) a portion of time spent presenting general background information and law in the fee petition.

---

[7] The total amount of fees claimed for the Equal Protection claim ($71,456.90), the as-applied claim ($12,255.00), and the vagueness claim ($4,181.29) is $196,737.96. The fee expenses incurred by Turlock ($4,181.29) on the vagueness claim amount to 2.13 percent of $196,737.96.

The court has also reviewed the Declaration of Benjamin Fay, filed in support of Defendants' motion for attorney's fees. (Doc. 227.) His declaration explains that all legal services were provided by the law firm of Jarvis Fay & Deporto, LLP. Work on this matter was provided primarily by Mr. Fay and his partner Rick Jarvis, each of whom have considerable litigation experience in similar matters. (*See* Exhibits A & B to the Fay Decl.) Mr. Fay and Mr. Jarvis each billed the City at the standard discount rate of $225 per hour for partners, while associates billed at $175 per hour, and paralegals at $100 per hour. These are reasonable rates to bill a public entity. Wal-Mart interposes no objection to these hourly rates.

Also attached to the Fay Declaration is a detailed billing spreadsheet, indicating the specific tasks performed for each unit of time billed, and allocating portions of the hours billed to each of the four claims in the case. The bills are reasonably detailed and do not indicate excessive or wasteful billing practices.

## IV. CONCLUSION

For the reasons set forth above, Turlock is entitled to a fee award for expenses incurred defending against the vagueness claim ($4,181.29) and for twenty percent (20%) of its fees-on-fees request ($4,187.50) for a total fee award of ($8,368.79).

IT IS SO ORDERED.

**Dated: March 12, 2007** **/s/ Oliver W. Wanger**
b2e55c UNITED STATES DISTRICT JUDGE